UNITED STATES DISTRICT COURT

<u>SOUTHERN DISTRICT OF NEW YORK</u>

RECEIVED
SDNY PRO SE OFFICE
2019 MAY 15  AM 8: 36

16 CASA DUSE, LLC, Plaintiff,

-against-

ALEX MERKIN and A. MERKIN

ENTERTAINMENT, LLC,

<u>Defendants.</u>

No. 12 Civ. 3492 (RJS) (HBP)

<u>Opposition Of Motion For Attorney's Fees And Sanctions</u>

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5-15-19

Alexander Merkin
15101 Magnolia Blvd
Apt. E15
Sherman Oaks, CA, 91403
Tel: 917.664.2693
Alexander.Merkin@gmail.com

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES………………………………………… ii

PRELIMINARY STATEMENT……………………………………… 1

OPISITION ARGUMENT …………………………………………… 6-17

EVIDENCE …………………………………………………… 18- 73

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

(Randall Park Jockey V. Automatic Totalisators

  283 F.2d 113 (sixth Cir. 1960)…………………………………………    7


*(1)JP Morgan Chase v. J.H. Elec. of N.Y., Inc.,*
69 A.D.3d 802, 803 (2d Dept. 2010)……………………………………   10

*M&T Bank Corp. v. Gemstone CDO VII, Ltd.,*
68 A.D.3d 1747, 1750-51 (4th Dept. 2009)…………………………………   10

**Rules and Statutes**

Model Rule 3.1. ……………………………………………………………    5

Labor Law section 193………………………………………………………...   13


Labor Law section 198-c(1)………………………………………… …………13

New York Penal Code Article 210, et seq…………………………………………13
*Second-Degree*

C130-1.1(c)(3)…………………………………………………   15

specific evidence that contradicts most of the statements that Robert Krakovski has made in order to shape a winning argument/story. This makes me question if the plaintiffs Attorney Eleanor M. Lackman ever even read any of the emails exchanged between Krakovski and I or just accepted Robert Krakovski's version of the facts on faith alone. Every lie that has been told by the plaintiff has had an affect on the ruling in this case. In my ARGUMENT, I will bring to light each lie (in a straightforward and concise way while providing the page number of the evidence to refer to. You will see in my ARGUMENT emails, details, and witness statements that will prove that this lawsuit is frivolous(Model Rule 3.1) and based off .

Never could I have imagined, eight years later, that I would be in this position.  I am asking you Judge Sullivan, I am begging you to please grant the dismissal of this motion and grant an end to this agony once and for all. This has gone on for so long and I wish we could all move on with our lives. I do not want to spend the next 30+ years of my life struggling to payoff a colossal amount of debt that was assigned to me from a frivolous lawsuit over a job that I never even got paid for and turned other jobs down for.   I have Directed many films, have had many contracts, and never in my life have I ever had to deal with anything like this. My career has been stained in irrevocable ways from this lawsuit. I have lived the past 8 years with utter anxiety and depression from the stress of this lawsuit. It is extremely hard writing this opposition. I swear under oath, that all of the facts that I present to you are true, supplying evidence to support all claims.

# PRELIMINARY STATEMENT

Eight years ago, I, Alexander Merkin was contacted by Robert Krakovski (who I will also be referencing as 16 CASA DUSE in this brief) about taking part in a short film endeavor. This would be Robert Krakovski's first time producing a film. He did however have some experience in theatre. Even still, it is like comparing apples to oranges. He was eager to come to me with the idea of financing a short film from the stage play "Heads Up." He had rights to use the stage play for a film and he had a very low budget to produce it (15,000 dollars not 45,000 dollars as he claims he spent in their brief. I will supply evidence in my ARGUMENT).

To this day, I have never received my compensation as Director of this project.  But at this point I am honestly tired of this ordeal and I just want this to end. As you will see in my ARGUMENT, I have evidence which reveals how this situation really unfolded and all the lies Robert Krakovski has told.  I never wanted to go to court. I did everything I could to resume negotiations with Robert after he ended talks and to resolve our contract issues outside of court. And my motivation, you will see in my argument, was to protect my rights as an artist. There has been a strong effort by the plaintiff to paint a negative and distorted picture of me. After reading through the facts that I have to present, 16 Casa Duse's motion, there is no way that these  can be looked at in any way other than the intention to deceive the court, thus constituting perjury. These lies have undoubtedly compromised the ruling that I have lost. I will be showing you

## OPPISITION ARGUMENT

**1. The claim that I was always intended to be a work-for-hire employee, was the award winning claim on 16 Casa Duses copywrite victory. They lied.**

A.I have an email dated December 8th, 2010, that Robert Krakovski sent to myself and both producers, Gary Gimelfarb and Hannah Fierman (see page 18) Also I must note, that this email's subject line is documented as, "Contracts, et al." This email was the first ever contract for director employment and producer employment (see contract: page19 -34). This was the very first form of our contract. This contract is not a work-for-hire agreement. The first time work-for-hire was added to this agreement was February 25, 2011, when it was emailed to me. I was working in Romania during that period and I didn't have time to go through the contract while I was working.  You will see on the first page of this contract that Robert Krakovski  added the term work-for-hire (see page 35) and I have attached the whole contract for continuity on pages 35 - 50).

B.  October 29th 2010, Robert Krakovski emailed me. In his email he stated, "… am open to discussing any agreement options" (see on page 51).

C.  November 21, 2010 Robert Krakovski emailed me this time stating, "Have you considered what bare minimum and what sort of agreement you would require to be involved in the project?" (See page 52) In my responding email to Robert Krakovski I wrote "As for type of agreement, I'm not sure how to answer that. … I can certainly look at any agreements and let you know if they work or don't work for me, and how to change them." (see page 53)

As you can see, from the very beginning of our working relationship, Robert Krakovski was asking me what type of contract I would need. This is unmistakable evidence proving that 16 Casa Duse did not go into our work relationship with the intention of work-for-hire. I had never consented to work-for-hire, and I have always opposed that language in the contract, from the moment I became aware that it had been added.

I would like to reference "the case of Randall Park Jockey V. Automatic Totalisators, the district court ruled that "even if the ambiguous language of the letters indicated a willingness by the defendant to abide by the written, but unsigned, agreement, the [plaintiff must show complete agreement as to the contract…The court found that the assignor of the plaintiff had not consented to the terms of the unsigned agreement; and that, therefore, there was never a contract."(Randall Park Jockey V. Automatic Totalisators 283 F. 2d 113 (sixth Cir. 1960)

## 2. 16 Casa Duse either falsified the budget of the film to the court in order to overstate the financial burden, or lied to the entire cast and crew of "Head's up,"  in order to under pay them the value of the work they were doing.

**A.** The budget of the short film "Heads Up," was always represented as 15,000 throughout preproduction, and until the end of production.

1. On page 12 of the plaintiffs appeal motion, document143 filed 3/22/19, the plaintiff cites that the budget of the film was "roughly $45,000." This is three times the budget quoted to myself, and the cast and crew of the film. (see page 54).

of my time, energy, and hard work into this film with the understanding that I would edit the film and finish the vision that I had created. I care deeply about my work, my art. I take my career seriously and when all of my rights are being stripped away from me, what is someone in this situation supposed to do?  I urged Robert Krakovski to come back to the negotiating table and resolve this on several occasions.

This media agreement was created and signed by both parties to prevent exactly what Robert Krakovski ended up doing. What justifies Robert Krakovski's actions in taking my unfinished work, and telling me that he has found another editor. We signed a media agreement that specifically stated that I was to edit the film.

2.. The second breech: Robert Krakovski schedules multiple viewings of the film, while still under the same Media Agreement which states, "…edited version will not be released by either party until a comprehensive media agreement is reached." (see page 55)  When I found out about the first screening that Robert Krakovski arranged (without my knowledge, consent, paying me for the work I did, or the legal right to use my work(which means without a contract in place )), I found out through a crew member that Robert Krakovski was to screen the film without my knowledge or permission, and even told him before the screen took place that I was not comfortable or okay with him screening the film in the absence of contract. I can't tell you how much stress and anxiety it caused me to know that the work I spent so much time on and was so passionate about, had been edited without my input or permission. An editor has the capacity to change the films

2. The pay rates and various departments budgets were calculated based on the 15,000 budget.

## 3. "Heads Up" Media Agreement, breech of Media Agreement by 16 Casa Duse.

While our contracts were still under negotiation, as we started to acknowledge that the resolution may take longer then expected, we decided to draft up a short form agreement that would protect both sides during the negotiation process, and so that I could receive footage to begin editing the film. ( see page 55). The media agreement specifically states, "… the parties agree that Alex Merkin will commence the editing process of the film which edited version will not be released by either party until a comprehensive media agreement is reached." Robert Krakovski breeched this Media Agreement not once, but multiple times.

1. The first breech:  Robert Krakovski walked away from negations and sought out another editor. He told me he was unwilling to address my concerns and simply abandoned all negotiations with me, as if I had not already directed the film. The Media Agreement states, "…. The parties agree that Alex Merkin will commence the editing process of the film…"  I would have never agreed to sign on to this short film if I had known that I would not be given the opportunity to complete my artistic vision for the film. Please understand, my profession is my art. I am always careful about the projects that I sign on to, especially when those projects require a great deal of my time and offer very little compensation. My motivation for doing this film was not the 1,500.00 that was offered to me. It was the opportunity to create a film that I was passionate about. I had invested months

vision, intentions, and overall quality dramatically.  I directed this film with every edit in mind and had specific footage I shot for moments that no one but me  could know the intentions of because I wasn't given the opportunity to finish it, or even to give my input on it. This enevitabley had an effect on the artistic integrity of the film, which was now being exhibited to industry professionals with my name on it. To protect myself, I called the venue and told them that I was the director of the film, and that we had not reached an agreement, and that this film was being screened with out my consent (Robert Krakovski has falsely claimed that I made some mention or threat of a cease and assist order. Which I absolutely never did. ) Ben Carlin, the writer of the script, called me back and begged me to give my permission to have the film screened that night. To be fair even still, I told Ben Carlin that If Robert Krakovski promises to stop screening the movie until our contract is finalized, I would agree to give my consent to the venue owner to screen the film that stop. Ben Carlin told me he would talk to Robert Krakovski and get back to me. When Ben Carlin called me back, he told me that Robert Krakovski would not agree, and they canceled the screening. The only thing I have ever sought to do, was to protect my rights as an artist, my name as a filmmaker/my careers reputation, and the hard work I had already invested in this project.

I would like to reference this case on breeched agreements: (1)JP Morgan Chase v. J.H. Elec. of N.Y., Inc., 69 A.D.3d 802, 803 (2d Dept. 2010) " a plaintiff must identify the specific terms of the agreement upon which the claim is based." *M&T Bank Corp. v. Gemstone CDO VII, Ltd.*, 68 A.D.3d 1747, 1750-51 (4th Dept. 2009). " After all, if the plaintiff cannot identify the terms of the agreement alleged

to have been breached, s/he cannot prove that the defendant breached the agreement."

This case should have never gone to court. This could have been handled if Robert Krakovski had been more fair and reasonable during our contract negotiations and not have abandoned them. The issues between us were never irreconcilable. Please note: I was advised to file a copyright in order to try to protect my Rights while Robert Krakovski was continuously ignoring and violating them. By screening the film without our contract in place, without my permission, while making no attempt to resolve the contract. Resolving the contract would have legally granted 16 Casa Duse the rights(as well as the copyright) that he has frivolously spent roughly 200,000.00 in court fee's fighting for.

**4. DENY:**
**the plaintiffs argument on the motion for their appeal(page 11/23 on document 143 filed03/22/29) reads   "16 CASA DUSE SHOULD BE COMPENSATED FOR HAVING TO DEFEND AGAINST THE SORT OF GROUNDLESS ARGUMENTS THAT 16 CASA DUSE NEVER SHOULD HAVE HAD TO ENDURE IN DEFENDING ITS RIGHTS TO FULFILL ITS OBLIGATIONS TO THE FILM'S CREATORS"**

A. 16 Casa Duse's argument is referencing case *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 526-27 (1994). The policies set forth in the landmark case *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 526-27 (1994) do not apply to 16 Casa Duse.

1. First off, a director is not only one of the films creators, but arguably the most important as his job is to interpret and adapt all ideas,

concepts, themes and tones, and create a tangible piece of a finished work.

As a producer of a film, Robert Krakovski's first and most important obligation is to work out agreements from each and every cast and crew member and obtain signatures which would legally grant him the rights to the film. His failure to see our agreement through was him choosing to not fulfill his obligations to the project. Robert Krakovski did not fulfill our mutual agreement and maintain my position as an editor to the Film(which was one of my conditions to taking part in this movie in the first place). My creative interests were not protected. Rather then acquire my rights as director(the Artistic Creater of the film), legally through an agreement, he chose to ignore and violate those rights. This is the opposite of protecting the creative rights of the Film's Creator.

### 5. Robert Krakovski had numerous disputes with crew members showing that he was a very difficult person to work with and for.

A. May 10th, 2011, our production designer, Dara Wishingrad contacted me concerned with the way she had been treated by Robert Krakovski and over her contract negotiation with the film. " His nickel and dime-ing, micromanaging and offering one thing then refusing it later has become untenable…" and "Reguarding the contract, Robert has set and ultimatum that I can not and will not meet." (see page 56). June 3rd, 2011, Dara contacted me letting me know that Robert Kravoski was refusing to honor her contract and was withholding payment. (see page 57).

B. On the first day of filming, I was informed that there was an altercation between Robert Krakovski and Shije Solilid, the location manager. She quit the film that day and refused to open the location and turn in the keys until Robert Krakovski had settled outstanding debt that he owed her. I was informed about this, let it be known that I did not witness this first hand.

C. June 1, 2011 Elya Ottenberg, our Location Scout wrote me an email stating that Robert Krakovski is a "hothead" and was concerned he had just been fired from Robert Krakovski for inquiring about a financial commitment Robert Kravoski made. (See page 58).           .

I would like to Note that both Dara Wishingrad and Elya Ottenberg are professionals in their field with many years of experience in the film industry. I don't personally know Shije Solilid, so I can not speak to her experience. All of this helps to show you Robert Krakovski's pattern of breaking agreements, making contract negotiations unreasonable difficult, and expressing unpredictable and hostile attitudes and behavior. I would like to reference, **Labor Law section 193, which " protects all employees, regardless of position or income, against wage theft,[133]" and also N.Y. LAB. LAW § 193(1) (McKinney 2017). Labor Law section 198-c(1) authorizes criminal fines and/or jail against employers who fail to pay employees' benefits or wage supplements;"**

## 8. Robert Krakovski lied under oath which indicates perjury.

**A.** Robert Krakovski represented to the court that William Porter was a producer on the film. William Porter wrote a declaration stating that he was a producer on the film. (See page 59)(the full declaration is on pages 59-63) . This is

a false testimony and is filled with lies and misrepresentations. William Porter was not a producer and had no producer role or input on the film. As the director of the film, I am involved with every crew member associated with the film. William Porter had zero input on decision making or anything bearing on the preproduction or production of the short film "Heads Up." Neither I, nor anyone else in the cast and crew, during preproduction and production of the film, had ever met him or even heard his name before . The first I have ever heard of William Porter was in a declaration supporting the plaintiff's case(as previously stated on pages 59-63)

1.  I have an email from Robert Krakovski where he called a "full crew production meeting" and CC'ed all members of the crew (See page 64 ). You will find that William Porter is not poised as a recipient to this email, nor did he appear at this crucial full crew production meeting.

2.  The assistant director, Samatha Santo's, sent out a revised and full contact list to the entire crew (see page 65 and 66 for the list). You will find that the only producers that are listed on the crew are Robert Krakovski, Hanna Fierman, and Gary Gimelfarb. Not only is William Porter not listed as a producer on the film, he is not listed anywhere on the crew list, in any position. He is also not listed as a recipient to this contact list. (See page 67)

3.  Dara Wishingrad(production designer on the film) wrote a statement that confirms she had never worked with or heard of William Porter. (see page 68 paragraph 4and page 69)

4.  Gary Gimelfarb (one of the producers on the film) wrote a declaration that states he too had never known or heard of a person named William Porter. (see page 71 paragraph 5)

5.  When Head's Up was completed, a copy was sent to me so that I could decide whether or not I would be removing my name from the credits. In this completed version of the film, the only place where William Porters name appears in the credits, is in third position under the title, sound design, not

producer. Sound design is a position hired during the late stages of post production. A sound designer does not have anything to do with the prepping and production of a film, and they certainly don't have anything to do with producing a film.

This evidence shows that William Porter was never the producer of "Heads Up" and that Robert Krakovski never intended or saw him in that light(that is until he needed a declaration statement for court). Robert Krakovski intentionally deceived the court, by lying about William Porter being a Producer and by asking this person, William Porter, to lie on his behalf. Robert Krakovski lied under oath in naming William Porter a producer on the film "Head's Up" so that he could have a declaration that would support his position that I was brought on as a work-for-hire and contest that I was not involved with the creative development of the film. I would like to reference New York Penal Code Article 210, et seq. *Second-Degree:* A person is guilty of perjury in the second degree when he swears falsely and when his false statement is (a) made in a subscribed written instrument for which an oath is required by law, and (b) made with intent to mislead a public servant in the performance of his official functions, and (c) material to the action, proceeding or matter involved.

I would also like to reference "Wider definition of "frivolous." The amended rule widens the scope of frivolous conduct by providing that conduct is "frivolous" if it "asserts material factual statements that are false." [*See* C130-1.1(c)(3).]

# **CONCLUSION**

In my final conclusion, I would like to say this; contrary to the suggestions made by Robert Krakovski, there wasn't a motive on my part as to

why this contract was never was completed.  When Robert Krakovski sent me the contract draft, I was in Romania Directing a 13 episode series for HBO. We were on a very tight schedule and I was extraordinarily busy, averaging less then 4 hours of sleep a day. I had a skype call with Robert Krakovski after receiving the contract, I told him that I would do my best to address the contract when I could get to it. I explained to him (on more then one occasion)that since this was a short film, with a very low directors fee, I wouldn't be able to have my agents and managers(who normally handle my contracts) handle this. I would have to go over the contract myself with my lawyer who was in New York. I was in Romania at the time. Between the seven hour time difference and my crazy work schedule, there was honestly never a time that I could schedule several hours with my Lawyer going over the contract. If you think I could have looked at it myself I would like you to read the contract and see if you feel comfortable signing rights that you may not even be aware that you are signing in a 14 page contract. It feels extremely intimidating to someone who doesn't know what they are reading. There was a lot of verbiage to go through. I would never sign my name on a contract if I am not sure that doing that is in my best interest. I would hope to think most people wouldn't. From the moment I arrived back to New York, I was thrust into pre-production for the film "Head's Up." My sole focus and priority was immersing myself into all the creative needs of the film. For those who are unfamiliar with the nature of filmmaking, there is never enough time in a day to fully prepare for the start of production. I was focusing on my Job, and was working on this project all day and all night. It was Robert Krakovski's responsibility, as the producer of the film, to ensure that the contract gets signed. If it was a priority to get it signed before preproduction, then he should have informed me that he was either unwilling or couldn't begin the production of the film without a signed contract

and we would have been forced to resolve it accordingly. I argue that if Robert
Krakovski had fulfilled one of the most important responsibilities and obligations
in his position as Producer/ Executive Producer, none of this would have ever
happened. It is not uncommon, in my experience (which includes 8 Feature films,
39 episodes of television, numerous short films, commercials, music videos…), for
contract negotiations to continue on well after the completion of production and
sometimes after the completion of post production. I honestly didn't think anything
was concerning about the fact that we had not completed our agreement yet. I
have more proof of false claims by 16 Casa Duse and can provide them to you if
you request them and I am granted more time. But really I just want all of this to
end. Writing this brief  has completely exhausted me physically and emotionally.
The stress and trauma of having to relive this nightmare, the anxiety that comes
along with making calls to IP attorneys, struggling to even try to explain 8 years of
frivolous claims, and then trying to explain why/or how this lawsuit ever even
could have gone this far(it is difficult to understand for most). It was these things
that made finding representation all the more challenging. I am not responsible for
any of the plaintiffs fee's, and I feel that I have shown enough evidence to at least
have this, or this appeal dismissed.

Thank you,

Dated: Sherman Oaks California April 10, 2019

 By: /s/Alexander Merkin

Alexander Merkin

Tel:917.648.1119

Email: alexander.Merkin@Gmail.com

Defendant

# Contracts, et al  Inbox ✕

  

**ROBERT KRAKOVSKI** r2... 📎 Dec 8, 2010, 12:44 PM   ☆ ↩ ⋮

to garygimel, me, Hannah ▾

Gary & Alex,

   Here are the contract templates as attachments plus the revised breakdown and the sides I blocked out that went out to agents this morning. I'll follow up with an e-mail that will contain links to the different sound stage/locations I've been looking into. Hannah and I will be handling the scheduling of appointment times. If there are actors you want to bring in get us their contact info or have them contact us ASAP.

Thanks!
Rob

## 4 Attachments  



 HeadsUpBREAKDO...

 HEADS UP Auditio...

 DIR. EMPL. AGR. E...

Producer Employm...

# DIRECTOR EMPLOYMENT AGREEMENT
## (Non-Union)

Agreement dated _____, 20__, between _____ ("Director") and _____ ("Production Company").

1. EMPLOYMENT:   Production Company agrees to employ Director to perform and Director agrees to perform, upon the terms and conditions herein specified, directing services in connection with the Theatrical Motion Picture currently entitled "_____" (the "Picture").

2. TERM: The Term of this agreement shall commence on _____, 20__, and shall continue until the completion of all of Director's required services on the Picture.

3. SERVICES:

   (a) Pre-Production: Director shall be available and undertake a location search on or about _____.

   (b) Photography: Director's exclusive services for the Picture shall commence _____ weeks prior to the start of principal photography and shall be rendered exclusively after that until completion of all photography. The start date of principal photography shall be as Production Company designates. The scheduled start date of principal photography is _____.

   (c) Post-Production: Director's post-production services shall be rendered on   a non-exclusive but first-call basis, if Production Company so requires, in order to work during the post-production period with the editor until completion of the final corrected answer print.

      (i) Cooperation with Editor: Director hereby warrants and agrees that Director will cooperate with the picture editor and other post-production personnel and will do nothing to hinder or delay the assemblage of film by the editor during the photography of the Picture so that the assembled sequences will be completed immediately following the completion of principal photography.

      (ii) Post-Production Schedule:   Director agrees that the post-production schedule, which shall be agreed to in writing by Director and Production Company, shall be followed by Director.

Director Employment Agreement-Non-Union

1

(iii) Final Cutting Authority: _____ is designated as the Production Company Executive with final cutting authority over the Picture. The foregoing shall be subject to applicable guild and union requirements, if any.

(d) Dailies: Production Company shall have the right to view the dailies during the production of the Picture, the rough cut and all subsequent cuts of the Picture.

(e) Television Cover Shots: When protective cover shots are requested for any particular scene, Director shall furnish Production Company with such cover shots necessary for the release of the Picture on television, based on network continuity standards in existence at the time of commencement of principal photography.

(f) Additional Post-Production Services: If after the completion of principal photography, Production Company requires retakes, changes, dubbing, transparencies, added scenes, further photography, trailers, sound track, process shots or other language versions (herein collectively called "retakes, etc.") for the Picture, Director shall report to Production Company for such retakes, etc., at such place or places and on such consecutive or non-consecutive days as Production Company may designate. Provided Director is not then rendering services (pursuant to a contractual commitment) for another party, Director shall cooperate to make such services available to Production Company at the earliest possible date.

4. COMPENSATION: As full and complete consideration for Director's services and Director's undertakings hereunder and for all rights granted to Production Company hereunder, and subject to Director's full compliance with the terms and conditions of this Agreement, Production Company agrees to pay Director as follows:

(a) Fixed Compensation:

(i) The total sum of _____ payable in equal weekly installments over the course of pre-production, principal photography and post-production.

(ii) Flat Fee Basis: Production Company and Director hereby mutually acknowledge that the Fixed Compensation as hereinabove specified is a "flat fee" and Director shall not be entitled to any additional and/or so-called "overage" compensation for any services rendered by Director

Director Employment Agreement-Non-Union

2

during the development, pre-production, production or post-production phases, or for additional post-production services rendered by Director. Without limiting the generality of the foregoing, no additional compensation shall be payable to Director if the actual principal photography period for the Picture exceeds the scheduled principal photography period, nor for any services rendered pursuant to Clause 3(f).

(b) Deferred Compensation:   In addition to the Fixed Compensation payable under Clause 4(a), subject to the production and release of the Picture, and subject to the performance of all obligations of Director, the Director shall receive and an amount equal to $_____ per week, in first position of all contingent deferments payable out of no more than fifty percent (50%) of the Production Company's gross revenues from the Picture, after the investors in the Picture have recouped their entire investment plus ten percent, after recoupment of all costs of production, financing and repayment of loans, and after any deferments payable to any laboratories, post-production services and cost of becoming a signatory to any Guild agreements. The aforesaid payment shall be deferred and paid pro rata with all similar deferments.

(c) Contingent Compensation: In addition to the Fixed Compensation payable above, subject to the production and release of the Picture and subject to the performance of Director's obligations hereunder, Director shall be entitled to receive as Contingent Compensation an amount equal to _____ percent of one hundred percent (_____% of 100%) of the Net Profits of the Picture, if any (and after deducting the cost of becoming a signatory to any guild agreements).

(d) Net Profits Definition: All income actually received by Production Company from the exploitation of the Picture after deducting all expenses and deferments incurred by Production Company in connection with the financing (including all interest and fees owed), pre-production, production, post-production, investor recoupment, marketing, distribution and exploitation of the Picture; this shall also include any attorneys fees, expenses incurred by Production Company in connection with the Picture, residuals, union payments and the like. Also included within the Net Profits definition is a one percent (1%) deduction of the Production Company's gross income for Production Company operating expenses.

(e) Conditions Related to Compensation: Notwithstanding anything to the contrary contained in any of the above compensation provisions:

Director Employment Agreement-Non-Union

3

(i) Performance: No compensation shall accrue or become payable to Director during Director's inability, failure or refusal to perform the services contracted for herein according to the terms and conditions of this Agreement.

(ii) Pay or Play: Production Company shall not be obligated to use Director's services on the Picture, nor shall Production Company be obligated to produce, release, distribute, advertise, exploit or otherwise make use of the Picture; provided, however, that the full amount of the Fixed Compensation hereinabove specified shall be paid to Director should Production Company elect not to utilize Director's services.

(f) Vesting: The Fixed Compensation and Contingent Compensation hereinabove specified shall be deemed fully vested if, notwithstanding the termination of Director's services due to Production Company Disability or Director's Incapacity or Director Default, Director shall be entitled to receive "Directed by" credit by reference to the principles of the Director's Guild of America, Basic Agreement as same is amended and supplemented from time to time ("Basic Agreement").

If the services of Director are terminated by Production Company due to Production Disability or Director's Incapacity or Director Default, as defined below, and Director is not entitled to receive credit pursuant to the Basic Agreement, then the Fixed Compensation shall vest and accrue in the same manner as set forth herein and the Contingent Compensation shall accrue and vest in the same ratio that the number of linear feet in the completed Picture as released, which was directed by Director, bears to the total number of linear feet in the completed Picture as released. Notwithstanding the foregoing, if principal photography has not commenced on the scheduled start date as set forth in Clause 3(b) hereof, then the total Fixed Compensation shall vest and accrue on the aforesaid scheduled start date and production of the Picture is thereafter terminated prior to completion of principal photography and/or delivery of the final answer print to Production Company, then that portion of the Fixed Compensation not theretofore accrued shall fully vest and accrue on the date of such termination. If Production Company terminates this Agreement by reason of a Director Default, notwithstanding any vesting of Fixed Compensation and/or Contingent Compensation as set forth above, such vesting shall be subject to any and all the rights accorded to Production Company at law and in equity.

(g) Mitigation: If Production Company elects to exercise its pay or play right as set forth above and/or fails to produce the Picture, Director shall be obligated to mitigate damages.

4

Director Employment Agreement-Non-Union

5. CREDITS:

(a) Credit: Subject to the production and release of the Picture and provided Director performs his material obligations hereunder, then Production Company shall accord Director credit in connection with the Picture in accordance with the credit allocation rules of the Directors Guild of America, Basic Agreement, as amended and supplemented from time to time.  Said credit shall read:

"Directed by _____"

(b) Artwork Title Exception: If both a regular (or repeat) title and an artwork title are used, the position and percentage requirements above, as they relate to the title of the Picture, shall relate to the regular (or repeat) title. If only an artwork title is used, the percentage requirements above, as they relate to the title, shall be not less than ten percent (10%) of the average size of the letters used in the artwork title.

(c) Credit Limitation: Production Company agrees that no other individual and/or entity (other than members of the cast receiving "starring" billing before or after the title of the Picture or the company distributing and/or financing the Picture) shall receive credit larger than that used to display the credit accorded to Director and no other individual or entity shall receive a credit that is larger.

(d) Inadvertent Non-Compliance: No casual or inadvertent failure to comply with the provisions of this Paragraph shall be deemed to be a breach of this Agreement by Production Company. Director hereby recognizes and confirms that in the event of a failure or omission by Production Company constituting a breach of Production Company obligations under this Paragraph, the damages, if any, caused Director by Production Company are not irreparable or sufficient to entitle Director to injunctive or other equitable relief. Consequently, Director's rights and remedies hereunder shall be limited to the right, if any, to obtain damages at law and Director shall have no right in such event to rescind this Agreement or any of the rights assigned to Production Company hereunder or to enjoin or restrain the distribution or exhibition of the Picture. Production Company agrees to advise its assignees and licensees of the credit requirements herein. If Production Company shall learn of such failure of a third party to give such credit, Production Company shall notify such party of such failure and Production Company may, but shall not be obligated to, take action to cause such party to prospectively cure such failure.

5

Director Employment Agreement-Non-Union

6. TRANSPORTATION AND EXPENSES:

    (a)  Local Transportation/Expenses: no reimbursement.

    (b)    Distant Location expenses: Any expense allowance is limited to reimbursement of out-of-pocket gasoline expense. Location lodging (including a bed, sheets, pillow and blanket) and meals (continental breakfast and 2 meals per day) shall be provided by Production Company. A distant location shall be defined as one which is more than 75 miles from Director's residence. Any location expenses for purposes unrelated to the production are not reimbursable.

7. PERFORMANCE STANDARDS: Except as specifically provided to the contrary herein, during the Term of this Agreement, Director shall render his directive services exclusively to Production Company and, to such extent as Production Company may require, in otherwise assisting in the production of the Picture. Said services shall be rendered either alone or in collaboration with another or other artists in such manner as Production Company may direct, pursuant to the instructions, controls and schedules established by Production Company, and at the times, places and in the manner required by Production Company. Such manners, instructions, directions, and controls shall be exercised by Production Company in accordance with standards of reasonableness and also with what is customary practice in the Motion Picture industry. Such services shall be rendered in an artistic, conscientious, efficient and punctual manner, to the best of Director's ability and with full regard to the careful, efficient, economical and expeditious production of the Picture within the budget and shooting schedule established by Production Company immediately prior to the commencement of principal photography, it being further understood that the production of motion pictures by Production Company involves matters of discretion to be exercised by Production Company with respect to art and taste, and Director's services and the manner of rendition thereof is to be governed entirely by Production Company.

8. UNIQUE SERVICES: Except as specifically provided to the contrary hereinabove, Director's services shall be rendered exclusively to Production Company until expiration of the Term of this Agreement, it being mutually understood that said services are extraordinary, unique and not replaceable, and that there is no adequate remedy at law for breach of this contract by Director, and that Production Company, in the event of such breach by Director, shall be entitled to equitable relief by way of injunction or otherwise to prevent default by Director.

9. RESULTS AND PROCEEDS OF SERVICES: Production Company shall be entitled to and shall solely and exclusively own, in addition to Director's services hereunder, all results and proceeds thereof (including but not limited to all rights, throughout the world,

Director Employment Agreement-Non-Union

6

of copyright, trademark, patent, production, manufacture, recordation, reproduction, transcription, performance, broadcast and exhibition of any art or method now known or hereafter devised, including radio broadcasting, theatrical and non-theatrical exhibition, and exhibition by the medium of television or otherwise), whether such results and proceeds consist of literary, dramatic, musical, motion picture, mechanical or any other forms of works, themes, ideas, compositions, creations or production, together with the rights generally known in the field of literary and musical endeavor as the "moral rights of authors" in and/or to any musical and/or literary proceeds of Director's services, including but not limited to the right to add to, subtract from, arrange, revise, adapt, rearrange, make variations of the property, and to translate the same into any and all languages, change the sequence, change the characters and the descriptions thereof contained in the property, change the title of the same, record and photocopy the same with or without sound (including spoken words, dialogue and music synchronously recorded), use this title or any of its components in connection with works or motion pictures wholly or partially independent of said property, and to use all or any part of the property in new versions, adaptations and sequels in any and all languages, and to obtain copyright therein throughout the world, and Director does assign and transfer to Production Company all the foregoing without reservation, condition, or limitation, and no right of any kind, nature, or description is reserved by Director. If Production Company shall desire separate assignments or other documents to implement the foregoing, Director shall execute the same upon Production Company's request, and if Director fails or refuses to execute and deliver any such separate assignments or other documents, Production Company shall have and is granted the right and authority to execute the same in Director's name and as Director's attorney-in-fact. Production Company shall supply Director with a copy of any document so executed.

10. WARRANTIES RELATED TO CREATED MATERIAL: Director hereby warrants and agrees that all material, works, writings, idea, "gags" or dialogue written, composed, prepared, submitted or interpolated by Director in connection with the Picture or its preparation or production, shall be wholly original with Director and shall not be copied in whole or in part from any other work, except that submitted to Director by Production Company as a basis for such material. Director further warrants that neither said material nor any part thereof will violate the rights of privacy or constitute a libel or slander against any person, firm, or corporation, and that the material will not infringe upon the copyright, literary, dramatic or photoplay rights of any person. Director further warrants and agrees to hold Production Company and its successors, licensees, and assigns harmless against all liability or loss which they or any of them may suffer by reason of the breach of any of the terms or warranties of this Clause.

11. VESTING OF PRODUCTION COMPANY'S RIGHTS: All rights granted or agreed to be granted to Production Company hereunder shall vest in Production Company

7

Director Employment Agreement-Non-Union

immediately and shall remain so vested whether this Agreement expires in normal course or is terminated for any cause or reason.

12. NAME AND LIKENESS: Production Company shall always have the right to use and display Director's name and likeness for advertising, publicizing, and exploiting the picture. However, such advertising may not include the direct endorsement of any product (other than the Picture) without Director's consent.  Exhibition, advertising, publicizing or exploiting the Picture by any media, even though a part of or in connection with a product or a commercially sponsored program, shall not be deemed an endorsement of any nature.

13. PUBLICITY RESTRICTIONS: Director shall not by means of press agents or publicity or advertising agencies or others, employed or paid by Director or otherwise, circulate, publish or otherwise disseminate any news stories or articles, books or other publicity, containing Director's name relating to Director's employment by Production Company, the subject matter of this contract, the Picture or the services to be rendered by Director or others in connection with the Picture unless first approved by Production Company.

14. FORCE MAJEURE:

> (a) Suspension: If, by reason of fire, earthquake, labor dispute or strike, act of God or public enemy, any municipal ordinance, any state or federal law, governmental order or regulation, or other cause beyond Production Company's control which would excuse Production Company's performance as a matter of law, Production Company is prevented from or hampered in the production of the Picture, or if, by reason of the closing of substantially all theatres in the United States, Production Company's production of the Picture is postponed or suspended, or if, by reason of any of the aforesaid contingencies or any other cause or occurrence not within Production Company's control, including but not limited to the death, illness or incapability of any principal member of the cast of the Picture, the preparation or production of the Picture is interrupted or delayed and/or, if Production Company's normal business operations are interrupted or otherwise interfered with by virtue of any disruptive events which are beyond Production Company's control ("Production Company Disability"), then Production Company may postpone the commencement of or suspend the rendition of services by Director and the running of time hereunder for such time as the Production Company Disability shall continue; and no compensation shall accrue or become payable to Director hereunder during the period of such suspension.  Such suspension shall end upon the cessation of the cause thereof.

8

Director Employment Agreement-Non-Union

(b) Termination:

(i) Production Company Termination Right: If a Production Company Disability continues for a period in excess of _____ (_____) _____, Production Company shall have the right to terminate this Agreement upon written notice to Director.

(ii) Director's Termination Right: If a Production Company Disability results in compensation being suspended hereunder for a period in excess of _____ (_____) _____, Director shall have the right to terminate this Agreement upon written notice to Production Company.

(iii) Production Company Re-Establishment Right: Despite Director's election to terminate this Agreement, within five (5) days after Production Company's actual receipt of such written notice from Director, Production Company shall have the right to elect to re-establish the operation of this Agreement.

15. DIRECTOR'S INCAPACITY:  If, by reason of mental or physical disability, Director is incapacitated from performing or complying with any of the terms of conditions hereof ("Director's Incapacity") for a consecutive period in excess of seven (7) days or aggregate period in excess of ten (10) days, then Production Company shall have the right to terminate this Agreement upon written notice to Director.

16. DIRECTOR'S DEFAULT: If Director fails or refuses to perform or comply with any of the terms or conditions hereof (other than by reason of Director's Incapacity) ("Director's Default"), then Production Company may terminate this Agreement upon written notice to Director. Director Default shall not include any failure or refusal of Director to perform or comply with the material terms of this Agreement due to a breach or action by Production Company which makes the performance by Director of his services impossible. Prior to termination of this Agreement by Production Company based upon Director Default, Production Company shall notify Director specifying the nature of the Director Default and Director shall have a period of 24 hours to cure the Director Default. If the Director Default is not cured within said 24 hour period, Production Company may terminate this Agreement forthwith.

17. EFFECT OF TERMINATION: Termination of this Agreement, whether by lapse of time, mutual consent, operation of law, exercise of a right of termination or otherwise shall:

Director Employment Agreement-Non-Union

9

(a) Terminate Production Company's obligation to pay Director any further compensation. Nevertheless, if the termination is not for Director's Default, Production Company shall pay Director any compensation due and unpaid prior to the termination, and;

(b) Production Company shall not be deemed to have waived any other rights it may have or alter Production Company's rights or any of Director's agreements or warranties relating to the rendition of Director's services prior to termination.

18. PRODUCTION COMPANY RIGHT TO SUSPEND: In the event of Director's Incapacity or Director's Default, Production Company may postpone upon written notice the commencement of or suspend the rendition of services by Director and the running of time hereunder so long as any Director's Disability or Director's Default shall continue; and no compensation shall accrue or become payable to Director during the period of such suspension.

(a) Director's Right to Cure: Any Director's Incapacity or Director's Default shall be deemed to continued until Production Company's receipt of written notice from Director specifying that Director is ready, willing and able to perform the services required hereunder; provided that any such notice from Director to Production Company shall not preclude Production Company from exercising any rights or remedies Production Company may have hereunder or at law or in equity by reason of Director's Incapacity or Director's Default.

(b) Alternative Services Restricted: During any period of suspension hereunder, Director shall not render services for any person, firm or corporation other than Production Company.  However, Director shall have the right to render services to third parties during any period of suspension based upon a Production Company Disability, subject, however, to Production Company's right to require Director to resume the rendition of services hereunder.

(c) Production Company Right to Extend: If Production Company elects to suspend the rendition of services by Director as herein specified, then Production Company shall have the right (exercisable at any time) to extend the period of services of Director hereunder for a period equal to the period of such suspension.

(d) Additional Services: If Production Company shall have paid compensation to Director during any period of Director's Incapacity or Director's Default, then Production Company shall have the right (exercisable at any time) to require Director to render services hereunder without compensation for a period equal to

10

Director Employment Agreement-Non-Union

the period for which Production Company shall have paid compensation to Director during such Director's Incapacity or Director's Default.

19. FURTHER WARRANTIES: Director hereby warrants that Director is not under any obligation or disability, created by law or otherwise, which would in any manner or to any extent prevent or restrict Director from entering into and fully performing this Agreement; Director warrants that Director has not entered into any agreement or commitment that would prevent Director fulfilling Director's commitments with Production Company hereunder and that Director will not enter into any such agreement or commitment without Production Company's specific approval; and Director hereby accepts the obligation hereunder and agrees to devote Director's entire time and attention and best talents and abilities exclusively to Production Company as specified herein, and to observe and to be governed by the rules of conduct established by Production Company for the conduct of its employees.

(a) Indemnity: Director shall at all times indemnify Production Company, its successors, assignees and licensees, from and against any and all costs, expenses, losses, damages, judgments and attorneys' fees arising out of or connected with or resulting from any claims, demands or causes of action by any person or entity which is inconsistent with any of Director's representations, warranties or agreements hereunder. Director will reimburse Production Company on demand for any payment made by Production Company at any time after the date hereof in respect of any liability, loss, damage, cost or expense to which the foregoing indemnity relates.

20. REMEDIES: All remedies accorded herein or otherwise available to either Production Company or Director shall be cumulative, and no one such remedy shall be exclusive of any other. Without waiving any rights or remedies under this Agreement or otherwise, Production Company may from time to time recover, by action, any damages arising out of any breach of this Agreement by Director, and may institute and maintain subsequent actions for additional damages which may arise from the same or other breaches. The commencement or maintenance of any such action or actions by Production Company shall not constitute an election on Production Company's part to terminate this Agreement nor constitute or result in termination of Director's services hereunder unless Production Company shall expressly so elect by written notice to Director. The pursuit by either Production Company or Director of any remedy under this Agreement or otherwise shall not be deemed to waive any other or different remedy which may be available under this Agreement or otherwise, either at law or in equity.

21. INSURANCE:

11

Director Employment Agreement-Non-Union

(a)    Production Company may secure life, health, accident, cast, or other insurance covering Director, the cost of which shall be included as a Direct Charge of the Picture. Such insurance shall be for Production Company's sole benefit and Production Company shall be the beneficiary thereof, and Director shall have no interest in the proceeds thereof. Director shall assist in procuring such insurance by submitting to required examinations and tests and by preparing, signing, and delivering such applications and other documents as may be reasonably required. Director shall, to the best of Director's ability, observe all terms and conditions of such insurance of which Production Company notifies Director as necessary for continuing such insurance in effect.

(b)   If Production Company is unable to obtain pre-production or cast insurance covering Director at prevailing standard rates and without any exclusions, restrictions, conditions, or exceptions of any kind, Director shall have the right to pay any premium in excess of the prevailing standard rate in order for Production Company to obtain such insurance. If Director fails, refuses, to pay such excess premium, or if Production Company having obtained such insurance, Director fails to observe all terms and conditions necessary to maintain such insurance in effect, Production Company shall have the right to terminate this Agreement without any obligation to Director by giving Director written notice of termination.

22. EMPLOYMENT OF OTHERS: Director agrees not to employ any person to serve in any capacity, nor contract for the purchase or renting of any article or material, nor make any agreement committing Production Company to pay any sum of money for any reason whatsoever in connection with the Picture or services to be rendered by Director hereunder or otherwise, without written approval first being had and obtained from Production Company.

23. ASSIGNMENT: This Agreement, at the election of Production Company, shall inure to the benefit of Production Company's administrators, successors, assigns, licensees, grantees, and associated, affiliated and subsidiary companies, and Director agrees that Production Company and any subsequent assignee may freely assign this Agreement and grant its rights hereunder, in whole or in part, to any person, firm or corporation.

24. NOTICES AND PAYMENT:

(a)   To Director: All notices from Production Company to Director may be given in writing by mailing the notice to Director, postage prepaid, or at Production Company's option, Production Company may deliver such notice to Director

12

Director Employment Agreement-Non-Union

personally, either orally or in writing. The date of mailing or of personal delivery shall be deemed to be the date of service. Payments and written notice to Director shall be sent to Director at _____.

(b)   To Production Company: All notices from Director to Production Company shall be given in writing by mail, messenger, cable, telex or faxed addressed as indicated below. The date of mailing, messengering, cabling, telexing or faxing shall be deemed to be the date of service.

Mail: _____

_____

Fax   :   _____

(c)   Writing Requirement: Any oral notice given by Production Company in respect to any right of termination, suspension or extension under this Agreement shall be confirmed in writing.

(d)   Change of Address: The address of Director and of Production Company set forth herein may be changed to such other address as Director or Production Company may hereafter specify by written notice given to the other Party.

25. UNION/GUILD AGREEMENT: If Production Company becomes a signatory with the DGA, the provisions of the Basic Agreement as same is amended and supplemented from time to time, and any side letters shall control should they conflict with any of the terms of this agreement.

26. VIDEOCASSETTE: After domestic distribution of the Picture has been secured, Company shall provide Director with one VHS videocassette copy of the entire Picture, at Company's expense.

27. CONDITIONS AFFECTING OR RELATED TO COMPENSATION:

(a)   Method of Payment: All compensation which shall become due to Director shall be paid by Production Company by check and sent to Director at the address provided in the Notices and Payments provision of this Agreement.

(b) Governmental Limitation: No withholding, deduction, reduction or limitation of compensation by Production Company which is required or authorized by law ("Governmental Limitation") shall be a breach by Production Company or relieve Director from Director's obligations. Payment of compensation as permitted

13

Director Employment Agreement-Non-Union

pursuant to the Governmental Limitation shall continue while such Governmental Limitation is in effect and shall be deemed to constitute full performance by Production Company of its obligations respecting the payment of compensation. The foregoing-notwithstanding, if at such time as the Governmental Limitation is no longer in effect there is compensation remaining unpaid to Director, Production Company shall cooperate with Director in connection with the processing of any applications relative to the payment of such unpaid compensation and Production Company shall pay such compensation to Director at such times as Production Company is legally permitted to do so.

(c) Garnishment/Attachment: If Production Company shall be required, because of the service of any garnishment, attachment, writ of execution, or lien, or by the terms of any contract or assignment executed by Director, to withhold, or to pay to any other Party all or any portion of the compensation due Director, the withholding or payment of such compensation or any portion thereof in accordance with the requirements of any such attachment, garnishment, writ of execution, lien, contract or assignment shall not be construed as a breach by Production Company.

(d) Overpayment/Offset: If Production Company makes any overpayment to Director for any reason or if Director is indebted to Production Company for any reason, Director shall pay Production Company such overpayment or indebtedness on demand, or at the election of Production Company, Production Company may deduct and retain for its own account an amount equal to all or any part of such overpayment or indebtedness from any sums that may be due or become due or payable by Production Company to Director or for the account of Director and such deduction or retention shall not be construed as a breach by Production Company.

28. MISCELLANEOUS:

(a) Relationship:  This agreement between the parties does not constitute a joint venture or partnership of any kind.

(b) Cumulative Rights and Remedies:   All rights, remedies, licenses, undertakings, obligations, covenants, privileges and other property granted herein shall be cumulative, and Purchaser may exercise or use any of them separately or in conjunction with any one or more of the others.

14

Director Employment Agreement-Non-Union

(c) Waiver:  A waiver by either party of any term or condition of this agreement in any instance shall not be deemed or construed to be a waiver of such term or condition for the future, or any subsequent breach thereof.

(d) Severability:  If any provision of this agreement as applied to either party or any circumstances shall be adjudged by a court to be void and unenforceable, such shall in no way affect any other provision of this agreement, the application of such provision in any other circumstance, or the validity or enforceability of this agreement.

(e) Governing Law:  This agreement shall be construed in accordance with the laws of the State of _____ applicable to agreements which are executed and fully performed within said State.

(f) Arbitration: This Agreement shall be interpreted in accordance with the laws of the State of _____, applicable to agreements executed and to be wholly performed therein.  Any controversy or claim arising out of or in relation to this Agreement or the validity, construction or performance of this Agreement, or the breach thereof, shall be resolved by arbitration in accordance with the rules and procedures of the American Film Marketing Association, as said rules may be amended from time to time with rights of discovery if granted by the arbitrator. Such rules and procedures are incorporated and made a part of this Agreement by reference.   If the American Film Marketing Association shall refuse to accept jurisdiction of such dispute, then the parties agree to arbitrate such matter before and in accordance with the rules of the American Arbitration Association (AAA) under its jurisdiction in _____ before a single arbitrator familiar with entertainment law.  The parties shall have the right to engage in pre-hearing discovery in connection with such arbitration proceedings.   The parties agree hereto that they will abide by and perform any award rendered in any arbitration conducted pursuant hereto, that any court having jurisdiction thereof may issue a judgment based upon such award and that the prevailing party in such arbitration and/or confirmation proceeding shall be entitled to recover its reasonable attorneys' fees and expenses. The arbitration will be held in _____ and any award shall be final, binding and non-appealable.   The Parties agree to accept service of process in accordance with AFMA or AAA Rules.

(g) Captions:  Captions are inserted for reference and convenience only and in no way define, limit or describe the scope of this agreement or intent of any provision.

15

Director Employment Agreement-Non-Union

(h) Entire Understanding:  This agreement contains the entire understanding of the parties relating to the subject matter, and this agreement cannot be changed except by written agreement executed by the party to be bound.

IN  WITNESS WHEREOF, the parties hereto have signed this Agreement as of the day and year first above written.

_____

_____

("Production Company")


_____

_____

("Director")

Social Security Number: _____

Director Employment Agreement-Non-Union

16

# DIRECTOR EMPLOYMENT AGREEMENT

Agreement dated January 1st, 2011, between Alex Merkin ("Director") and 16 Casa Duse, LLC ("Production Company").

1. ENGAGEMENT:  Production Company agrees to engage Director as an Independent Contractor to perform and Director agrees to perform, upon the terms and conditions herein specified, directing services as a 'work-for-hire' in connection with the Theatrical Motion Picture currently entitled "Heads Up" (the "Picture").

2. TERM: The Term of this agreement shall commence on January 1st, 2011, and shall continue until the completion of all of Director's required services on the Picture.

3. SERVICES:

   (a) Pre-Production: Director shall be available during the pre-production phase for casting, production design development, location assessment, etc., commencing on January 1st, 2011.

   (b) Photography: Director's exclusive services for the Picture shall commence 3 (three) weeks prior to the start of principal photography and shall be rendered exclusively after that until completion of all photography. The start date of principal photography shall be as Production Company designates. The scheduled start date of principal photography is May 20th, 2011.

   (c) Post-Production: Director's post-production services shall be rendered on  a non-exclusive but first-call basis, if Production Company so requires, in order to work during the post-production period with the editor until completion of the final corrected answer print.

      (i) Cooperation with Editor: Director hereby warrants and agrees that Director will cooperate with the picture editor and other post-production personnel and will do nothing to hinder or delay the assemblage of film by the editor during the photography of the Picture so that the assembled sequences will be completed immediately following the completion of principal photography.

      (ii) Post-Production Schedule:  Director agrees that the post-production schedule, which shall be agreed to in writing by Director and Production Company, shall be followed by Director.

Director Employment Agreement-Non-Union

1

(iii) Final Cutting Authority: Robert Krakovski, Executive Producer is designated as the Production Company Executive with final cutting authority over the Picture. The foregoing shall be subject to applicable guild and union requirements, if any.

(d) Dailies: Production Company shall have the right to view the dailies during the production of the Picture, the rough cut and all subsequent cuts of the Picture.

(e) Television Cover Shots: When protective cover shots are requested for any particular scene, Director shall furnish Production Company with such cover shots necessary for the release of the Picture on television, based on network continuity standards in existence at the time of commencement of principal photography.

(f) Additional Post-Production Services: If after the completion of principal photography, Production Company requires retakes, changes, dubbing, transparencies, added scenes, further photography, trailers, sound track, process shots or other language versions (herein collectively called "retakes, etc.") for the Picture, Director shall report to Production Company for such retakes, etc., at such place or places and on such consecutive or non-consecutive days as Production Company may designate. Provided Director is not then rendering services (pursuant to a contractual commitment) for another party, Director shall cooperate to make such services available to Production Company at the earliest possible date.

4. COMPENSATION: As full and complete consideration for Director's services and Director's undertakings hereunder and for all rights granted to Production Company hereunder, and subject to Director's full compliance with the terms and conditions of this Agreement, Production Company agrees to pay Director as follows:

(a) Fixed Compensation:

(i) The total sum of $1,500.00 (One Thousand, Five Hundred Dollars) payable in equal installments following principal photography and post-production.

(ii) Flat Fee Basis: Production Company and Director hereby mutually acknowledge that the Fixed Compensation as hereinabove specified is a "flat fee" and Director shall not be entitled to any additional and/or so-called "overage" compensation for any services rendered by Director

Director Employment Agreement-Non-Union

2

during the development, pre-production, production or post-production phases, or for additional post-production services rendered by Director. Without limiting the generality of the foregoing, no additional compensation shall be payable to Director if the actual principal photography period for the Picture exceeds the scheduled principal photography period, nor for any services rendered pursuant to Clause 3(f).

(b) Deferred Compensation:   In addition to the Fixed Compensation payable under Clause 4(a), subject to the production and release of the Picture, and subject to the performance of all obligations of Director, the Director shall receive and an amount equal to $0 per week, in first position of all contingent deferments payable out of no more than fifty percent (50%) of the Production Company's gross revenues from the Picture, after the investors in the Picture have recouped their entire investment plus ten percent, after recoupment of all costs of production, financing and repayment of loans, and after any deferments payable to any laboratories, post-production services and cost of becoming a signatory to any Guild agreements. The aforesaid payment shall be deferred and paid pro rata with all similar deferments.

(c) Contingent Compensation: In addition to the Fixed Compensation payable above, subject to the production and release of the Picture and subject to the performance of Director's obligations hereunder, Director shall be entitled to receive as Contingent Compensation an amount equal to 0 percent of one hundred percent (0% of 100%) of the Net Profits of the Picture, if any (and after deducting the cost of becoming a signatory to any guild agreements).

(d) Net Profits Definition: All income actually received by Production Company from the exploitation of the Picture after deducting all expenses and deferments incurred by Production Company in connection with the financing (including all interest and fees owed), pre-production, production, post-production, investor recoupment, marketing, distribution and exploitation of the Picture; this shall also include any attorneys fees, expenses incurred by Production Company in connection with the Picture, residuals, union payments and the like. Also included within the Net Profits definition is a one percent (1%) deduction of the Production Company's gross income for Production Company operating expenses.

(e) Conditions Related to Compensation: Notwithstanding anything to the contrary contained in any of the above compensation provisions:

(i) Performance: No compensation shall accrue or become payable to Director during Director's inability, failure or refusal to perform the

3

Director Employment Agreement-Non-Union

services contracted for herein according to the terms and conditions of this Agreement.

(ii) Pay or Play: Production Company shall not be obligated to use Director's services on the Picture, nor shall Production Company be obligated to produce, release, distribute, advertise, exploit or otherwise make use of the Picture; provided, however, that the full amount of the Fixed Compensation hereinabove specified shall be paid to Director should Production Company elect not to utilize Director's services.

(f) Vesting: The Fixed Compensation and Contingent Compensation hereinabove specified shall be deemed fully vested if, notwithstanding the termination of Director's services due to Production Company Disability or Director's Incapacity or Director Default, Director shall be entitled to receive "Directed by" credit by reference to the principles of the Director's Guild of America, Basic Agreement as same is amended and supplemented from time to time ("Basic Agreement").

If the services of Director are terminated by Production Company due to Production Disability or Director's Incapacity or Director Default, as defined below, and Director is not entitled to receive credit pursuant to the Basic Agreement, then the Fixed Compensation shall vest and accrue in the same manner as set forth herein and the Contingent Compensation shall accrue and vest in the same ratio that the number of linear feet in the completed Picture as released, which was directed by Director, bears to the total number of linear feet in the completed Picture as released. Notwithstanding the foregoing, if principal photography has not commenced on the scheduled start date as set forth in Clause 3(b) hereof, then the total Fixed Compensation shall vest and accrue on the aforesaid scheduled start date and production of the Picture is thereafter terminated prior to completion of principal photography and/or delivery of the final answer print to Production Company, then that portion of the Fixed Compensation not theretofore accrued shall fully vest and accrue on the date of such termination.  If Production Company terminates this Agreement by reason of a Director Default, notwithstanding any vesting of Fixed Compensation and/or Contingent Compensation as set forth above, such vesting shall be subject to any and all the rights accorded to Production Company at law and in equity.

(g) Mitigation: If Production Company elects to exercise its pay or play right as set forth above and/or fails to produce the Picture, Director shall be obligated to mitigate damages.

5. CREDITS:

4

Director Employment Agreement-Non-Union

(a) Credit: Subject to the production and release of the Picture and provided Director performs his material obligations hereunder, then Production Company shall accord Director credit in connection with the Picture in accordance with the credit allocation rules of the Directors Guild of America, Basic Agreement, as amended and supplemented from time to time.  Said credit shall read:

"Directed by Alex Merkin"

(b) Artwork Title Exception: If both a regular (or repeat) title and an artwork title are used, the position and percentage requirements above, as they relate to the title of the Picture, shall relate to the regular (or repeat) title. If only an artwork title is used, the percentage requirements above, as they relate to the title, shall be not less than ten percent (10%) of the average size of the letters used in the artwork title.

(c) Credit Limitation: Production Company agrees that no other individual and/or entity (other than members of the cast receiving "starring" billing before or after the title of the Picture or the company distributing and/or financing the Picture) shall receive credit larger than that used to display the credit accorded to Director and no other individual or entity shall receive a credit that is larger.

(d) Inadvertent Non-Compliance: No casual or inadvertent failure to comply with the provisions of this Paragraph shall be deemed to be a breach of this Agreement by Production Company. Director hereby recognizes and confirms that in the event of a failure or omission by Production Company constituting a breach of Production Company obligations under this Paragraph, the damages, if any, caused Director by Production Company are not irreparable or sufficient to entitle Director to injunctive or other equitable relief. Consequently, Director's rights and remedies hereunder shall be limited to the right, if any, to obtain damages at law and Director shall have no right in such event to rescind this Agreement or any of the rights assigned to Production Company hereunder or to enjoin or restrain the distribution or exhibition of the Picture. Production Company agrees to advise its assignees and licensees of the credit requirements herein. If Production Company shall learn of such failure of a third party to give such credit, Production Company shall notify such party of such failure and Production Company may, but shall not be obligated to, take action to cause such party to prospectively cure such failure.

6. TRANSPORTATION AND EXPENSES:

5

Director Employment Agreement-Non-Union

(a)  Local Transportation/Expenses: no reimbursement.

(b)    Distant Location expenses: Any expense allowance is limited to reimbursement of out-of-pocket gasoline expense. Location lodging (including a bed, sheets, pillow and blanket) and meals (continental breakfast and 2 meals per day) shall be provided by Production Company. A distant location shall be defined as one which is more than 50 miles from Director's residence. Any location expenses for purposes unrelated to the production are not reimbursable.

7. PERFORMANCE STANDARDS: Except as specifically provided to the contrary herein, during the Term of this Agreement, Director shall render his directive services exclusively to Production Company and, to such extent as Production Company may require, in otherwise assisting in the production of the Picture. Said services shall be rendered either alone or in collaboration with another or other artists in such manner as Production Company may direct, pursuant to the instructions, controls and schedules established by Production Company, and at the times, places and in the manner required by Production Company. Such manners, instructions, directions, and controls shall be exercised by Production Company in accordance with standards of reasonableness and also with what is customary practice in the Motion Picture industry. Such services shall be rendered in an artistic, conscientious, efficient and punctual manner, to the best of Director's ability and with full regard to the careful, efficient, economical and expeditious production of the Picture within the budget and shooting schedule established by Production Company immediately prior to the commencement of principal photography, it being further understood that the production of motion pictures by Production Company involves matters of discretion to be exercised by Production Company with respect to art and taste, and Director's services and the manner of rendition thereof is to be governed entirely by Production Company.

8. UNIQUE SERVICES: Except as specifically provided to the contrary hereinabove, Director's services shall be rendered exclusively to Production Company until expiration of the Term of this Agreement, it being mutually understood that said services are extraordinary, unique and not replaceable, and that there is no adequate remedy at law for breach of this contract by Director, and that Production Company, in the event of such breach by Director, shall be entitled to equitable relief by way of injunction or otherwise to prevent default by Director.

9. RESULTS AND PROCEEDS OF SERVICES: Production Company shall be entitled to and shall solely and exclusively own, in addition to Director's services hereunder, all results and proceeds thereof (including but not limited to all rights, throughout the world, of copyright, trademark, patent, production, manufacture, recordation, reproduction, transcription, performance, broadcast and exhibition of any art or method now known or

Director Employment Agreement-Non-Union

6

hereafter devised, including radio broadcasting, theatrical and non-theatrical exhibition, and exhibition by the medium of television or otherwise), whether such results and proceeds consist of literary, dramatic, musical, motion picture, mechanical or any other forms of works, themes, ideas, compositions, creations or production, together with the rights generally known in the field of literary and musical endeavor as the "moral rights of authors" in and/or to any musical and/or literary proceeds of Director's services, including but not limited to the right to add to, subtract from, arrange, revise, adapt, rearrange, make variations of the property, and to translate the same into any and all languages, change the sequence, change the characters and the descriptions thereof contained in the property, change the title of the same, record and photocopy the same with or without sound (including spoken words, dialogue and music synchronously recorded), use this title or any of its components in connection with works or motion pictures wholly or partially independent of said property, and to use all or any part of the property in new versions, adaptations and sequels in any and all languages, and to obtain copyright therein throughout the world, and Director does assign and transfer to Production Company all the foregoing without reservation, condition, or limitation, and no right of any kind, nature, or description is reserved by Director. If Production Company shall desire separate assignments or other documents to implement the foregoing, Director shall execute the same upon Production Company's request, and if Director fails or refuses to execute and deliver any such separate assignments or other documents, Production Company shall have and is granted the right and authority to execute the same in Director's name and as Director's attorney-in-fact. Production Company shall supply Director with a copy of any document so executed.

10. WARRANTIES RELATED TO CREATED MATERIAL: Director hereby warrants and agrees that all material, works, writings, idea, "gags" or dialogue written, composed, prepared, submitted or interpolated by Director in connection with the Picture or its preparation or production, shall be wholly original with Director and shall not be copied in whole or in part from any other work, except that submitted to Director by Production Company as a basis for such material. Director further warrants that neither said material nor any part thereof will violate the rights of privacy or constitute a libel or slander against any person, firm, or corporation, and that the material will not infringe upon the copyright, literary, dramatic or photoplay rights of any person. Director further warrants and agrees to hold Production Company and its successors, licensees, and assigns harmless against all liability or loss which they or any of them may suffer by reason of the breach of any of the terms or warranties of this Clause.

11. VESTING OF PRODUCTION COMPANY'S RIGHTS: All rights granted or agreed to be granted to Production Company hereunder shall vest in Production Company immediately and shall remain so vested whether this Agreement expires in normal course or is terminated for any cause or reason.

7

Director Employment Agreement-Non-Union

12. NAME AND LIKENESS: Production Company shall always have the right to use and display Director's name and likeness for advertising, publicizing, and exploiting the picture. However, such advertising may not include the direct endorsement of any product (other than the Picture) without Director's consent.  Exhibition, advertising, publicizing or exploiting the Picture by any media, even though a part of or in connection with a product or a commercially sponsored program, shall not be deemed an endorsement of any nature.

13. PUBLICITY RESTRICTIONS: Director shall not by means of press agents or publicity or advertising agencies or others, employed or paid by Director or otherwise, circulate, publish or otherwise disseminate any news stories or articles, books or other publicity, containing Director's name relating to Director's employment by Production Company, the subject matter of this contract, the Picture or the services to be rendered by Director or others in connection with the Picture unless first approved in writing by Production Company.

14. FORCE MAJEURE:

> (a) Suspension: If, by reason of fire, earthquake, labor dispute or strike, act of God or public enemy, any municipal ordinance, any state or federal law, governmental order or regulation, or other cause beyond Production Company's control which would excuse Production Company's performance as a matter of law, Production Company is prevented from or hampered in the production of the Picture, or if, by reason of the closing of substantially all theatres in the United States, Production Company's production of the Picture is postponed or suspended, or if, by reason of any of the aforesaid contingencies or any other cause or occurrence not within Production Company's control, including but not limited to the death, illness or incapability of any principal member of the cast of the Picture, the preparation or production of the Picture is interrupted or delayed and/or, if Production Company's normal business operations are interrupted or otherwise interfered with by virtue of any disruptive events which are beyond Production Company's control ("Production Company Disability"), then Production Company may postpone the commencement of or suspend the rendition of services by Director and the running of time hereunder for such time as the Production Company Disability shall continue; and no compensation shall accrue or become payable to Director hereunder during the period of such suspension.  Such suspension shall end upon the cessation of the cause thereof.

> (b) Termination:

Director Employment Agreement-Non-Union

8

(i) Production Company Termination Right: If a Production Company Disability continues for a period in excess of 4 months (four months), Production Company shall have the right to terminate this Agreement upon written notice to Director.

(ii) Director's Termination Right: If a Production Company Disability results in compensation being suspended hereunder for a period in excess of 4 months (four months), Director shall have the right to terminate this Agreement upon written notice to Production Company.

(iii) Production Company Re-Establishment Right: Despite Director's election to terminate this Agreement, within five (5) days after Production Company's actual receipt of such written notice from Director, Production Company shall have the right to elect to re-establish the operation of this Agreement.

15. DIRECTOR'S INCAPACITY: If, by reason of mental or physical disability, Director is incapacitated from performing or complying with any of the terms of conditions hereof ("Director's Incapacity") for a consecutive period in excess of seven (7) days or aggregate period in excess of ten (10) days, then Production Company shall have the right to terminate this Agreement upon written notice to Director.

16. DIRECTOR'S DEFAULT: If Director fails or refuses to perform or comply with any of the terms or conditions hereof (other than by reason of Director's Incapacity) ("Director's Default"), then Production Company may terminate this Agreement upon written notice to Director. Director Default shall not include any failure or refusal of Director to perform or comply with the material terms of this Agreement due to a breach or action by Production Company which makes the performance by Director of his services impossible. Prior to termination of this Agreement by Production Company based upon Director Default, Production Company shall notify Director specifying the nature of the Director Default and Director shall have a period of 24 hours to cure the Director Default. If the Director Default is not cured within said 24 hour period, Production Company may terminate this Agreement forthwith.

17. EFFECT OF TERMINATION: Termination of this Agreement, whether by lapse of time, mutual consent, operation of law, exercise of a right of termination or otherwise shall:

(a) Terminate Production Company's obligation to pay Director any further compensation. Nevertheless, if the termination is not for Director's Default,

9

Director Employment Agreement-Non-Union

Production Company shall pay Director any compensation due and unpaid prior to the termination, and;

(b) Production Company shall not be deemed to have waived any other rights it may have or alter Production Company's rights or any of Director's agreements or warranties relating to the rendition of Director's services prior to termination.

18. PRODUCTION COMPANY RIGHT TO SUSPEND: In the event of Director's Incapacity or Director's Default, Production Company may postpone upon written notice the commencement of or suspend the rendition of services by Director and the running of time hereunder so long as any Director's Disability or Director's Default shall continue; and no compensation shall accrue or become payable to Director during the period of such suspension.

(a) Director's Right to Cure: Any Director's Incapacity or Director's Default shall be deemed to continued until Production Company's receipt of written notice from Director specifying that Director is ready, willing and able to perform the services required hereunder; provided that any such notice from Director to Production Company shall not preclude Production Company from exercising any rights or remedies Production Company may have hereunder or at law or in equity by reason of Director's Incapacity or Director's Default.

(b) Alternative Services Restricted: During any period of suspension hereunder, Director shall not render services for any person, firm or corporation other than Production Company.  However, Director shall have the right to render services to third parties during any period of suspension based upon a Production Company Disability, subject, however, to Production Company's right to require Director to resume the rendition of services hereunder.

(c) Production Company Right to Extend: If Production Company elects to suspend the rendition of services by Director as herein specified, then Production Company shall have the right (exercisable at any time) to extend the period of services of Director hereunder for a period equal to the period of such suspension.

(d) Additional Services: If Production Company shall have paid compensation to Director during any period of Director's Incapacity or Director's Default, then Production Company shall have the right (exercisable at any time) to require Director to render services hereunder without compensation for a period equal to the period for which Production Company shall have paid compensation to Director during such Director's Incapacity or Director's Default.

10

Director Employment Agreement-Non-Union

19. FURTHER WARRANTIES: Director hereby warrants that Director is not under any obligation or disability, created by law or otherwise, which would in any manner or to any extent prevent or restrict Director from entering into and fully performing this Agreement; Director warrants that Director has not entered into any agreement or commitment that would prevent Director fulfilling Director's commitments with Production Company hereunder and that Director will not enter into any such agreement or commitment without Production Company's specific approval; and Director hereby accepts the obligation hereunder and agrees to devote Director's entire time and attention and best talents and abilities exclusively to Production Company as specified herein, and to observe and to be governed by the rules of conduct established by Production Company for the conduct of its employees.

(a) Indemnity: Director shall at all times indemnify Production Company, its successors, assignees and licensees, from and against any and all costs, expenses, losses, damages, judgments and attorneys' fees arising out of or connected with or resulting from any claims, demands or causes of action by any person or entity which is inconsistent with any of Director's representations, warranties or agreements hereunder. Director will reimburse Production Company on demand for any payment made by Production Company at any time after the date hereof in respect of any liability, loss, damage, cost or expense to which the foregoing indemnity relates.

20. REMEDIES: All remedies accorded herein or otherwise available to either Production Company or Director shall be cumulative, and no one such remedy shall be exclusive of any other. Without waiving any rights or remedies under this Agreement or otherwise, Production Company may from time to time recover, by action, any damages arising out of any breach of this Agreement by Director, and may institute and maintain subsequent actions for additional damages which may arise from the same or other breaches. The commencement or maintenance of any such action or actions by Production Company shall not constitute an election on Production Company's part to terminate this Agreement nor constitute or result in termination of Director's services hereunder unless Production Company shall expressly so elect by written notice to Director. The pursuit by either Production Company or Director of any remedy under this Agreement or otherwise shall not be deemed to waive any other or different remedy which may be available under this Agreement or otherwise, either at law or in equity.

21. INSURANCE:

(a)      Production Company may secure life, health, accident, cast, or other insurance covering Director, the cost of which shall be included as a Direct

Charge of the Picture. Such insurance shall be for Production Company's sole benefit and Production Company shall be the beneficiary thereof, and Director shall have no interest in the proceeds thereof. Director shall assist in procuring such insurance by submitting to required examinations and tests and by preparing, signing, and delivering such applications and other documents as may be reasonably required. Director shall, to the best of Director's ability, observe all terms and conditions of such insurance of which Production Company notifies Director as necessary for continuing such insurance in effect.

(b) If Production Company is unable to obtain pre-production or cast insurance covering Director at prevailing standard rates and without any exclusions, restrictions, conditions, or exceptions of any kind, Director shall have the right to pay any premium in excess of the prevailing standard rate in order for Production Company to obtain such insurance. If Director fails, refuses, to pay such excess premium, or if Production Company having obtained such insurance, Director fails to observe all terms and conditions necessary to maintain such insurance in effect, Production Company shall have the right to terminate this Agreement without any obligation to Director by giving Director written notice of termination.

22. EMPLOYMENT OF OTHERS: Director agrees not to employ any person to serve in any capacity, nor contract for the purchase or renting of any article or material, nor make any agreement committing Production Company to pay any sum of money for any reason whatsoever in connection with the Picture or services to be rendered by Director hereunder or otherwise, without written approval first being had and obtained from Production Company.

23. ASSIGNMENT: This Agreement, at the election of Production Company, shall inure to the benefit of Production Company's administrators, successors, assigns, licensees, grantees, and associated, affiliated and subsidiary companies, and Director agrees that Production Company and any subsequent assignee may freely assign this Agreement and grant its rights hereunder, in whole or in part, to any person, firm or corporation.

24. NOTICES AND PAYMENT:

(a) To Director: All notices from Production Company to Director may be given in writing by mailing the notice to Director, postage prepaid, or at Production Company's option, Production Company may deliver such notice to Director personally, either orally or in writing. The date of mailing or of personal delivery shall be deemed to be the date of service. Payments and written notice to Director shall be sent to Director at 30 West 13th Street, New York, New York 10011.

12

Director Employment Agreement-Non-Union

(b)   To Production Company: All notices from Director to Production Company shall be given in writing by mail, messenger, cable, telex or faxed addressed as indicated below. The date of mailing, messengering, cabling, telexing or faxing shall be deemed to be the date of service.

Mail: Robert Krakovski
        16 Prospect Park West, Brooklyn, New York 11215

Fax     : 718-783-2660

(c)   Writing Requirement: Any oral notice given by Production Company in respect to any right of termination, suspension or extension under this Agreement shall be confirmed in writing.

(d)   Change of Address: The address of Director and of Production Company set forth herein may be changed to such other address as Director or Production Company may hereafter specify by written notice given to the other Party.

25. UNION/GUILD AGREEMENT: If Production Company becomes a signatory with the DGA, the provisions of the Basic Agreement as same is amended and supplemented from time to time, and any side letters shall control should they conflict with any of the terms of this agreement.

26. VIDEOCASSETTE: After domestic distribution of the Picture has been secured, Company shall provide Director with one VHS videocassette/DVD copy of the entire Picture, at Company's expense.

27. CONDITIONS AFFECTING OR RELATED TO COMPENSATION:

(a)   Method of Payment: All compensation which shall become due to Director shall be paid by Production Company by check and sent to Director at the address provided in the Notices and Payments provision of this Agreement.

(b) Governmental Limitation: No withholding, deduction, reduction or limitation of compensation by Production Company which is required or authorized by law ("Governmental Limitation") shall be a breach by Production Company or relieve Director from Director's obligations. Payment of compensation as permitted pursuant to the Governmental Limitation shall continue while such Governmental Limitation is in effect and shall be deemed to constitute full performance by Production Company of its obligations respecting the payment of compensation.

13

Director Employment Agreement-Non-Union

The foregoing-notwithstanding, if at such time as the Governmental Limitation is no longer in effect there is compensation remaining unpaid to Director, Production Company shall cooperate with Director in connection with the processing of any applications relative to the payment of such unpaid compensation and Production Company shall pay such compensation to Director at such times as Production Company is legally permitted to do so.

(c)   Garnishment/Attachment: If Production Company shall be required, because of the service of any garnishment, attachment, writ of execution, or lien, or by the terms of any contract or assignment executed by Director, to withhold, or to pay to any other Party all or any portion of the compensation due Director, the withholding or payment of such compensation or any portion thereof in accordance with the requirements of any such attachment, garnishment, writ of execution, lien, contract or assignment shall not be construed as a breach by Production Company.

(d)   Overpayment/Offset: If Production Company makes any overpayment to Director for any reason or if Director is indebted to Production Company for any reason, Director shall pay Production Company such overpayment or indebtedness on demand, or at the election of Production Company, Production Company may deduct and retain for its own account an amount equal to all or any part of such overpayment or indebtedness from any sums that may be due or become due or payable by Production Company to Director or for the account of Director and such deduction or retention shall not be construed as a breach by Production Company.

28. MISCELLANEOUS:

(a) Relationship:  This agreement between the parties does not constitute a joint venture or partnership of any kind.

(b) Cumulative Rights and Remedies:   All rights, remedies, licenses, undertakings, obligations, covenants, privileges and other property granted herein shall be cumulative, and Purchaser may exercise or use any of them separately or in conjunction with any one or more of the others.

(c) Waiver:  A waiver by either party of any term or condition of this agreement in any instance shall not be deemed or construed to be a waiver of such term or condition for the future, or any subsequent breach thereof.

14

Director Employment Agreement-Non-Union

(d) Severability:  If any provision of this agreement as applied to either party or any circumstances shall be adjudged by a court to be void and unenforceable, such shall in no way affect any other provision of this agreement, the application of such provision in any other circumstance, or the validity or enforceability of this agreement.

(e) Governing Law:  This agreement shall be construed in accordance with the laws of the State of New York applicable to agreements which are executed and fully performed within said State.

(f) Arbitration: This Agreement shall be interpreted in accordance with the laws of the State of New York, applicable to agreements executed and to be wholly performed therein.  Any controversy or claim arising out of or in relation to this Agreement or the validity, construction or performance of this Agreement, or the breach thereof, shall be resolved by arbitration in accordance with the rules and procedures of the American Film Marketing Association, as said rules may be amended from time to time with rights of discovery if granted by the arbitrator.  Such rules and procedures are incorporated and made a part of this Agreement by reference.   If the American Film Marketing Association shall refuse to accept jurisdiction of such dispute, then the parties agree to arbitrate such matter before and in accordance with the rules of the American Arbitration Association (AAA) under its jurisdiction in New York City before a single arbitrator familiar with entertainment law.   The parties shall have the right to engage in pre-hearing discovery in connection with such arbitration proceedings.   The parties agree hereto that they will abide by and perform any award rendered in any arbitration conducted pursuant hereto, that any court having jurisdiction thereof may issue a judgment based upon such award and that the prevailing party in such arbitration and/or confirmation proceeding shall be entitled to recover its reasonable attorneys' fees and expenses. The arbitration will be held in New York City and any award shall be final, binding and non-appealable.  The Parties agree to accept service of process in accordance with AFMA or AAA Rules.

(g) Captions:  Captions are inserted for reference and convenience only and in no way define, limit or describe the scope of this agreement or intent of any provision.

(h) Entire Understanding:  This agreement contains the entire understanding of the parties relating to the subject matter, and this agreement cannot be changed except by written agreement executed by the party to be bound.

15

Director Employment Agreement-Non-Union

Case 1:12-cv-03492-RJS

IN  WITNESS WHEREOF, the parties hereto have signed this Agreement as of the day and year first above written.

_____

16 Casa Duse, LLC
("Production Company")   _____   _____
                         Robert Krakovski, Sole Proprietor      Date


_____

Alex Merkin
("Director")             _____   _____
                         Alex Merkin                            Date

Social Security Number: _____

16

Director Employment Agreement-Non-Union

# Short Film ⟫   Inbox ×

**ROBERT KRAKOVSKI** r2tk@verizon.net <u>via</u> …   Oct 29, 2010, 1:03 PM   ☆ ↩ ⋮

to me ▾

Alex,

  I can only attribute the difficulty in discussing this project to your overwhelming schedule. Let me just lay out what my proposed production schedule is and see if it can jive with yours. If not then I'll know sooner rather than later to make other considerations.

  I return from California on 11/8. I'm planning on a 2 day shoot with a 3rd for safety ideally in early January, but no later than early February. I am going to use the time from when I return to January 1st to cover all pre-production; securing location, casting, FX shops - several of which I've already vetted, any creative; production/set design, story boarding, scoring ideas, plus securing all crew and equipment needed, etc. In an ideal world I'd like to have something to an editor by late February, early March. To be clear I will be fully funding the project through '16 Casa Duse, LLC', which also owns the screen play and film rights, and am open to discussing any agreement options.

  Let me know what your thoughts are and if there's anything else I can let you know. Thanks.

Rob Krakovski
646-220-3140

**Alex Merkin** <amerkin@g...   Tue, Nov 23, 2010, 9:39 AM
to ROBERT

Thanks! That sounds great...very excited to hear about what's cooking on the crewside. I know you guys are meeting with Gary today. He's great. Very resourceful and very experienced. Total straight shooter.

As for the type of agreement, I'm not sure how to answer that. I haven't had many different types of agreements when getting involved with projects but when I do my agents and managers handle that. So working outside of that system, I wouldn't really know what type of agreement to bring to the table...I can certainly look at any agreements and let you know if they work or don't for me, and how to change them. Also, as far as a bare minimum, I'm open to working with the budget. I generally get in the 5-10% range of a production's overall budget as a fee, but as I said, I'm open to working with what will be best for the production.

The casting timeline sounds great. I look forward to discussing further.

Best,

Alex

●●●

...

**ROBERT KRAKOVSKI** r2tk@verizon.net <u>via</u> …   Oct 30, 2010, 1:14 PM   ☆   ↩   ⋮

to me ▾

Hey Alex,

  The show is going really well - I'm surprised at how the time has flown by.

  I'm totally cool with your situation and I'm sorry to hear that you've been feeling so lousy. It's just when I don't hear anything that I start to wonder. Enough said about that.

  I would like to lock down a schedule before Thanksgiving but I can push that to the first week in December. I've currently allocated $15,000 for the project. However I still need to get some ball park numbers on the FX, which in my estimation need to be first rate, as well as location - I'd like to use a sound studio to allow for maximum flexibility during production - and equipment rental.

  Hope you're back on your feet soon.

Rob Krakovski

# "HEADS UP" MEDIA AGREEMENT

Alex Merkin acknowledges receipt of a hard drive containing raw footage of the film currently entitled "Heads Up" based on material provided by the Production Company, 16 Casa Duse, LLC. Alex Merkin has directed the footage contained on this drive. The parties have yet to finalize an agreement with respect to the film. Alex Merkin warrants and represents that the footage on this drive will not be licensed, sold, copied, exhibited, transferred, in part or in whole, for personal or public use for any purpose whatsoever by the Director without prior written consent from the Production Company. Notwithstanding the forgoing, the parties agree that Alex Merkin will commence the editing process of the film which edited version will not be released by either party until a comprehensive agreement is reached between them.


16 Casa Duse, LLC                                            Date  6-1-2011
Producer                    Robert Krakovski, Sole Proprietor/Executive Producer


                                                            Date  6/1/11
Alex Merkin, Director

# Heads Up screenplay  Inbox ✕   

**ROBERT KRAKOVS…**  Sun, Nov 21, 2010, 6:42 PM ☆ 

to me ▾

Alex,

  I've attached the script in screenplay format.

  The meeting with Samantha Santos went very well. We have potentially an embarrassment of riches for us to choose from on the crew front - we'll need to discuss these options if all things are a go for having you on board. Have you considered what the bare minimum and what sort of agreement you would require to be involved in the project? The sooner we can settle on director, D.P., etc., the sooner we can move ahead with location, casting and other elements. I'd like to start looking at possible casting before the Christmas Holidays. Let me know your thoughts.

Best,
Rob Krakovski
646-220-3140



📄 Heads Up Screen P…

# Fwd: HEADS UP Contract Dispute   Inbox ×

**Dara Wishingrad** <dhiwish11@aol.com>                    Jun 1, 2011, 7:27 AM
to me, Gary ▾

so this is Rob's response to the issues he created.

looks like he has unfortunately chosen to make this a legal matter.


DARA WISHINGRAD
PRODUCTION DESIGNER
917 968 1958 M.
HTTP://VIMEO.COM/DARAWISHINGRAD/VIDEOS

SALAAMSHALOM
.......................................................
...............................


Begin forwarded message:

> **From:** ROBERT KRAKOVSKI <r2tk@verizon.net>
> **Date:** June 1, 2011 9:44:23 AM EDT
> **To:** Dara Wishingrad <dhiwish11@aol.com>
> **Subject: HEADS UP Contract Dispute**

**Dara Wishingrad** <dhiwish11@aol.com>                    Jun 3, 2011, 3:16 PM
to me ▾

hi Alex,

So Rob is still refusing to pay me and and I wanted to update you
since you asked me to if that were the case. The emails about this follow in order of receipt.

According to our signed agreement, the 1/3 deposit was to be paid before my continuing
work and I was supposed to be paid the balance by Day 1. Since I have not been paid at all,
I have stopped all continued work on this project until I am paid in full and as per our contract.

In answer to your questions:
I was advised by a couple of people-including my bank manager-not to alter his check by writing "void" on it. According to his email below, he has since
stopped payment on that check, which he could have done when I first texted him about the error.

Also, while I did not deposit the check immediately upon receipt (due to 12+ hour
pre-production days for this job), it didn't occur to me that there would be a problem,
until my bank bounced it back when I could finally get to the bank last Saturday on my
way out of town.

I will respond one more time to Rob with the above info and again request payment.
If he sends me payment in full and it clears, I will finish up my wrap out and send
everything on to him. Otherwise, I will do no more work on this job until I am paid.

Just wanted to let you know this is where it stands...still.

speak soon and thank you for your support.
xod


DARA WISHINGRAD
PRODUCTION DESIGNER
917 968 1958 M.
HTTP://VIMEO.COM/DARAWISHINGRAD/VIDEOS

SALAAMSHALOM
.......................................................
...............................

Case 1:12-cv-03492-RJS

 **Dara Wishingrad** <dhiwish11@aol.com>
to me, Alex ▾

 Tue, May 10, 2011, 5:43 PM ☆ ↩ ⋮

hi Alex,
it was great speaking with you, thank you for your support and
I hope that shooting is going well!

Please forgive the long email that follows, but I wanted to reiterate my concerns and let you know that Rob stated that if I don't sign the deal as is, he is hiring someone else.

Alex, I would never back out of a job on you or Gary, however Rob has set an ultimatum that I cannot and will not meet. I do understand that this is Rob's first film, and while I have no issue with that at all, he has hired people who do have a lot of experience and I feel he should be willing to learn from and allow us all to do our respective jobs.

His nickel and dime-ing, micromanaging and offering one thing then refusing it later has become untenable. I do not feel that I would be able or "allowed" to do my job the best way I know how. I am also concerned that he would find some way to not pay me, as his behaviour is like that of unscrupulous producers that I (and probably we all unfortunately have) worked with in the past. I think he is confusing "unorthodox" with something else entirely.

Here is my most recent correspondence with Rob.
There are 2 forwarded emails here - the first is my most recent email to him addressing his concerns and questions on the deal, and the second is his response after having Hannah write back to me and text me numerous times on Sunday/Mother's Day.

From his email below, it would appear that he did not read my most recent email since he is rehashing things I already addressed and agreed to. However, there are 4 things I cannot compromise:

- I would (of course and as usual!) make sure everything is the way you want it and that we have all elements we need, but due to my experience of Rob thus far, I will not sign a deal memo agreeing to work on a flat rate for him. His original offer was $250/day for 8 days which is plenty of time to make this movie happen art-wise, as long as I don't have to keep wasting all this time trying to convince him to let go and let me do my job.

- I have worked 3 days already since February, and given that he has continuously changed the terms of his original offer, I must receive a down payment of at least 1/3 of the total due or my time already worked before I move ahead on everything listed in my last email to him, below.

Since he is including in the deal that I am "not responsible for maintaining the set etc" during shoot and since shooting was moved to a time when I am out of town, I must have the balance due to me on delivery of the set, to either me or my representative. I added this into my most recent redlined deal memo, and am guessing he removed it in his "absolute final" version.

- I will not agree to signing with #6 in place (the bit about "PD agrees to cooperate with the EP etc") In addition to *never* appearing in any contract which I have signed or seen in 10 years, it is too broad of a language to put into *any* contract, is implicit in the work we do, and is, quite quite simply insulting. It appears to be another way for him to try and micro-manage (ie: if he wants a pink pony in the set and I don't, is that grounds for him not to pay me??)

-I am happy to meet Hannah's propmaster/friend and have requested to see their resume, along with meeting everyone else he is volunteering for the art dept. It appears that he is refusing this and is planning on hiring a propmaster himself. If I "am the art dept", as is typical of the PD role as well as he stated, then I must be able to hire my own crew. Otherwise, I cannot guarantee their work. I am happy to meet his volunteers but I need to meet and know who will be working with me!

Also, I have never asked for "carte blanche" on transpo or anything else, nor have I asked to be handed a credit card...that is Rob's language. In my email, I clearly stated exactly what he can expect from me going forward re: budget/breakdown/estimates and expense reports which will also show anticipated transpo and other non-art production expenses.

He has not responded to any of this information nor to the fact that we will need an experienced art person to be my stand-in/representative to dress the set since it has been rescheduled to a time when I am away. Alex, I am also concerned that he would show up for the install and attempt to do something different than whatever you and I agree on.

Lastly, Rob needs to realise that while we all do this work because we love it and consider ourselves artists, for all of his key crew, this is also our business and how we make our living. I think that he needs to consider his own words about "mutual cooperation" and let the people he has hired, do their job and make him a great film.

speak soon Alex, and
I look forward to your thoughts

xod

DARA WISHINGRAD
PRODUCTION DESIGNER
917 968 1958 M.
HTTP://VIMEO.COM/DARAWISHINGRAD/VIDEOS

SALAAMSHALOM
...............................................
...........................

Fw: Father Jim HEADS UP Project          Inbox ×          Case 1:12-cv-03492-RJS

**Elya Ottenberg** <elsousio@yahoo.com>                              Wed, Jun 1, 2011, 7:24 AM
to me, Gary

Dude is a hothead.  Not sure what "I view the 27th to be the final day of your services" means.  Did he just "fire" me?

Weird.

Elya Ottenberg
917.226.7175
elsousio@yahoo.com

----- Forwarded Message ----
**From:** ROBERT KRAKOVSKI <r2tk@verizon.net>
**To:** Elya Ottenberg <elsousio@yahoo.com>
**Sent:** Wed, June 1, 2011 10:04:07 AM
**Subject:** Re: Father Jim HEADS UP Project

Elya,
 I just read this e-mail from you all the way through - *Seriously*?! Please show me where I said I wasn't going to pay Marcello as offered or indicated I was reneging on anything? I am a person of my word and have done nothing but honor my committments with courtesy and respect to others.
 As you insisted on remaining the point man with Marcello until Friday the 27th I view that to be the final day of your services. I have fulfilled my contractual obligation and have posted your payment in full for services rendered to your address, and you will receive it within the ten day period indicated in the agreement.
 You really should be clear of the facts before leading with accusations.
 Thank you for all your hard work on the picture, 'Heads Up'.


Rob Krakovski
16 Casa Duse, LLC
    --- On **Mon, 5/23/11, Elya Ottenberg** <elsousio@yahoo.com> wrote:

> From: Elya Ottenberg <elsousio@yahoo.com>
> Subject: Father Jim
> To: "ROBERT KRAKOVSKI" <r2tk@verizon.net>
> Cc: "Gary Gimelfarb" <garygimel@gmail.com>
> Date: Monday, May 23, 2011, 12:39 PM
>
> Howdy,
>
> So I just cc'd you on an email to Father Jim explaining the transitioning of contact.  Wanted you to have the phone numbers and addresses as well.
>
> The rectory is 84 Herbert St at the corner of Monitor St in Brooklyn (zip 11222).  That's where you sign out a key.  BUT, there should be no need, we can get the key directly from Marcello.  The main office line is 718-389-0010, which I believe you have.  It's usually Mary Ann that answers there.  Everything is pretty well arranged, no need to bug them from what I see, they try to be hands off.
>
> Our shooting location is 21 Monitor Street between Richardson and Herbert Streets.
>
> Father Jim's phone number is 917-882-1477 and his email is jkwanderer@aol.com.  Again, there are a ton of projects that shoot there that overwhelm his already busy schedule running the church, so he tries to be hands off.  There should be no need to contact him once he responds to the email I cc'd you about a time to give him the insurance and donation.  I would even suggest, if you don't hear back from him, calling the main office line and asking a good time to come by when he might be in the office rather than calling his cell.
>
> Marcello's info is 646-318-4434 and borja.marcelo@gmail.com.  Dara will be moving the stuff in to the gallery on Tuesday from 5-8.  On Friday, to recap, Marcelo will be shooting stills in the basement until approx. 2-3pm.  I don't see a reason why we couldn't bring other equipment into the building prior to him wrapping the stills shoot, we just need to wait til he is done in the kitchen to start dressing.  Again, let's try not to bug him during a very busy shoot same as we would not have time for introductory calls or fielding questions in the middle of ours.  I would still prefer to be the point of contact with him until Friday.
>
> Additionally, we should provide a donation check to Marcello on Friday as well.  This is something I had discussed with you and offered him way back when we were trying to switch dates with him and buy him out, and we are essentially buying time off of him Tuesday and Friday.  $200 would be appropriate.
>
> I know we are a broke production at this point, but here is the reality.  I was informed that we had between 500-800/day for four days of shoot/dress/strike for a location, and secured a location for 1700 (1500 to cc's, 200 to marcello), which is below even the bottom end of the budget I was told to work within.  I was also told to try and offer money to him to gain flexibility for us on dates outside of our secured range long ago.  You have said recently that that money is now spent, which is understandable but was also quite a surprise to me, as I was given no indication that was the case or a possibility and was continuing my negotiations with the same information you had given me regarding financials.  200 for two extra partial days of access on a property that is already way below budget at 500per is a steal, and we need to honor our commitments.
>
> I would also like you to mail my fee check to:
> Elya Ottenberg
> 460 15th Street #4
> Brooklyn NY 11215
>
> I will be back in town for less than a day on June 1st and will need to be able to put that in the bank before leaving town again.
>
> I'm still available by phone and email for support.  Feel free to call me anytime, always happy to help.
>
> Elya Ottenberg
> 917.226.7175
> elsousio@yahoo.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

16 CASA DUSE, LLC,

                Plaintiff,

    -against-

ALEX MERKIN and A. MERKIN
ENTERTAINMENT, LLC,

                Defendants.

12 Civ. 3492 (RJS) (HBP)

## DECLARATION OF WILLIAM PORTER

WILLIAM PORTER declares as follows:

1.      I am a producer of the film short entitled *Heads Up* (the "Film"). I submit this declaration in support of 16 Casa Duse's Motion for Summary Judgment against defendants Alex Merkin and A. Merkin Entertainment, LLC (referred to herein collectively as "Merkin").

2.      Over the years, I have worked with Robert Krakovski ("Krakovski"), principal of 16 Casa Duse, LLC ("16 Casa Duse"), on several entertainment related projects and have known him to be a very hands-on collaborator. Through these projects, I have come to trust his creative instincts and industry knowledge.

3.      I have over forty years of experience in all facets of film and video production and have been involved in countless projects at all stages of the process, from the development of the concept and design to execution and post-production. I am an experienced director, editor, cinematographer, light designer, audio engineer, animator, as well as a software and system designer. In addition, I am the president and principal of my own multimedia production company, Whitehorse Productions, Inc.

4.      For at least two years prior to the development of the Film, Krakovski and I

explored the prospect of collaborating on a short film project.

5.      Over the course of several discussions, we discussed and developed our vision for the ideal short film property, one that was low-budget, but could nevertheless make an impact and serve as a springboard for future film projects.

6.      To keep this vision within reach, Krakovski and I concluded that our short film should contain no more than one or two characters, filmed at a single location.

7.      After reviewing several scripts, Krakovski concluded that Ben Carlin's stage play, "Heads Up," was a perfect match and after reading it myself, I concurred.

8.      The script was fully developed long before Merkin became involved and contained all that was needed to begin principal photography, including the stage directions necessary to guide the director, cast, and crew.   However, as a practical matter the script did not require very many stage directions, as the characters were to remain seated throughout the majority of the story.  In fact, one of the character's hands was impaled by a knife and pinned to a table throughout the entire Film, so movement was very restricted.

9.      By the time Krakovski set out to hire the cast and crew, he had a solid vision for the Film.

10.      During the pre-production phase, I primarily served as a creative consultant and provided financing and budgeting advice to the production company.   In addition, because of my experience in the entertainment industry, I advised Krakovski about the various types of contracts that would have to be procured from the cast and crew.

11.      Though I had never heard of or met Merkin before he became involved in the Film, I have come to trust Krakovski's instinct and creative vision.  Moreover, there was no reason to believe that Merkin would not deliver professional quality directorial services.  It is my

understanding that Merkin also promised to create storyboards and shot lists, though to the best of my knowledge, neither of these was ever delivered.

12.    After the three day shoot wrapped, I became heavily involved in the post-production phase including, but not limited to, preparing the footage and audio content for editing.

13.    It is my understanding that Merkin was interested in creating a director's cut of the Film. This is not unusual – directors are usually encouraged to deliver their own cut. Only after the shoot had wrapped did I learn that Merkin wanted to usurp complete creative control over the Film's final cut, which I found to be unusual, absurd and borderline offensive, particularly given the work that went into the Film for nearly a year before Merkin was hired. More importantly, I understood the Film to be the product of Krakovski's creative vision — a vision that he developed long before engaging Merkin – not to mention the fact that Krakovski's production company funded everything. I regarded Merkin's obsession with final cut to be completely out of line with how this Film developed. If Merkin had written the script and spent a good deal of time developing the project before bringing it to Krakovski to finance, then maybe an argument could have been made for Merkin to negotiate for final cut at the time Merkin was engaged. But as far as I know, Merkin never raised this issue until well after the shoot.

14.    In keeping with Krakovski's creative vision, he and I, along with Teace Snyder, the co-editor, proceeded to edit the footage in accordance with Krakovski's direction and vision. Once satisfied with the completed project, 16 Casa Duse set about screening the Film.

15.    While the Film had been screened for small groups of friends and family once or twice before, on April 18, 2012, 16 Casa Duse hosted its first major screening at the New York Film Academy ("NYFA"). Because of my longstanding involvement in the entertainment

industry, I was able to secure the attendance of several high-profile guests. This was to be the Film's first big break and a major chance for the cast and crew to catch the attention of the film industry. Because I personally invited several of our high-profile guests, I had a lot of my professional credibility invested in the NYFA screening's success.

16.     Just before the screening was set to begin, NYFA Chair Claude Kerven approached Krakovski and I and informed us he had been contacted by a lawyer who claimed he was in possession of a court order which prevented the Film from being screened. In an abundance of caution Mr. Kerven informed us that NYFA would not be able to permit the Film to be shown that evening.

17.     After learning the news, the Film's writer, Ben Carlin, contacted Merkin by telephone to smooth things over with NYFA so that the screening would proceed. During that conversation I overheard Ben Carlin asking Merkin to act reasonably and to not jeopardize the screening for all of us involved in the Film. Unfortunately, his attempts were unsuccessful. I got the impression from the call that Merkin thought his reputation would be tarnished by being associated with the Film, that all ownership rights in the Film resided with him, and that nobody else could do another version of the Film without his approval. There is no question in my mind that Merkin had his lawyer call NYFA in order to put leverage on Krakovski to give Merkin whatever he wanted.

18.     After the cancellation was announced, I was incredibly mortified, especially because I had put my reputation on the line in inviting the high-profile industry guests that evening. After leaving NYFA, I decided to go home to avoid further embarrassment.

19.     Because this Film was intended to be a portfolio piece for all of those involved, the inability to screen it – particularly under an allegation of copyright infringement – is

professionally damaging, apart from being a waste of time and money.  Moreover, the Film

exists in part to show off our talents.  As they say in the business, "you're only as good as your

last project."  If the Film is not shown, the entire purpose and investment in our time, money, and

effort is defeated.

20.     Fortunately, this Court's preliminary injunction has given a film which was

otherwise dead in the water, a second life, enabling it to serve its greater goal of advancing the

cast and crew's craft and promoting the careers of all that were involved.  True to its purpose, the

Film has been accepted to numerous festivals, garnering critical praise and receiving a number of

awards.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.

Dated:    New York, New York
          October 1, 2012

                                                    _____
                                                    WILLIAM PORTER

## HEADSUP CONTACT LIST

| DEPARTMENT | NAME | CONTACT | EMAIL |
|---|---|---|---|
| PRODUCTION | | | |
| Exec. Producer | Robert Krakovski | 646.220.3140 | r2tk@verizon.net |
| Producer | Hannah Fierman | 404.545.5688 | hannahfierman@gmail.com |
| Producer | Gary Gimelfarb | 201.759.1017 | garygimel@gmail.com |
| Director | Alex Merkin | 917.664.2693 | alexander.merkin@gmail.com |
| CONTINUITY | | | |
| Script sup. | Stella Iannitto | 917.889.5630 | stelacas@hotmail.com |
| AD DEPT | | | |
| 1st AD | Samantha Santos | 361.774.6051 | samantha.santos21@gmail.com |
| 2nd AD | Suzanna Hay | 845.926.0642 | abuhleen@gmail.com |
| CAMERA | | | |
| Director of Photography | Lukasz Pruchnik | 646.824.1642 | lukaszdp@gmail.com |
| 1st Asst. Camera | Jon Carr | 215.820.7767 | joncarr@visualcinema.com |
| 2nd Asst. Camera/ DIT | Giacamo Francia | 347.469.4523 | francia.giacomo@gmail.com |
| Camera PA | Nam Cho | 201.602.4505 | namcho1983@gmail.com |
| SOUND | | | |
| Sound Mixer | Sonam Gray | 843.902.9930 | sound@sonamgray.com |
| Boom Op. | Phil Payson | 203.260.5724 | plpayson@gmail.com |
| Sound Assistant | Dan Harray | 646.420.6622 | danielmharray@aol.com |
| G&E | | | |
| Gaffer | Jigme Tenzing | 917.250.7269 | jigmedp@gmail.com |
| Key Grip | Gautam Kadian | 201.450.4608 | gautam.kadian@gmail.com |

HEADS UP Full Crew Production Meeting   Inbox ×                                    Sat, May 21, 2011, 12:40 PM

**ROBERT KRAKOVSKI** r2tk@verizon.net via yahoo.com
to Alex, me, Samantha, Samantha, Gary, Hannah, Lukasz, Jigme, Jigme, Gautam, Carlos, Sonam, Phil, Stella, Stella, Jeremy, Shije, Tom, Dan, SUZANNA, Anupama, Dara, btc213, Cheryl

Hello Everyone,
  I think most of you know me but for those who don't I'm Rob Krakovski the executive producer of the film short 'Heads Up'. For those of you who may not have seen the script I've attached a copy.
  To better facilitate a smooth production I'm scheduling a full crew production meeting for everyone to get acquainted, give you a run down of scheduling/procedures/general production plan, give you an idea of what to expect and field any questions you might have.
  The meeting is scheduled for **Wednesday May 25th at 2pm, at 'Ciao', the corner of Bleeker and MacDougal. It's important that everyone be present but if anybody has a scheduling conflict for this meeting you should contact the A.D., Samantha Santos** (cell 361-774-6051  samantha.santos21@gmail.com  samantha_s76@hotmail.com ) **as soon as possible.** Otherwise we'll plan to see you there.
  I'm very excited by the superb team and talents that have come together for this project. I'm confident that it will all come together for a great production. I look forward to working with you all and seeing you on the 25th!

Rob
16 Casa Duse, LLC
646-220-3140

 HEADS UP (format...

from:    **ROBERT KRAKOVSKI** <r2tk@verizon.net> via yahoo.com

to:    Alex Merkin <alexander.merkin@gmail.com>,
       Alex Merkin <amerkin@gmail.com>,
       Samantha <samantha_s76@hotmail.com>,
       Samantha Santos <samantha.santos21@gmail.com>,
       Gary Gimelfarb <garygimel@gmail.com>,
       Hannah Fierman <hannahfierman@gmail.com>,
       Lukasz Pruchnik <lukaszdp@gmail.com>,
       Jigme Tenzing <jigmedp@gmail.com>,
       Jigme Tenzing <yongbajig@gmail.com>,
       Gautam Kadian <gautam.kadian@gmail.com>,
       Carlos Garcia de Dios <carlosgarciadedios@gmail.com>,
       Sonam Gray <sound@sonamgray.com>,
       Phil Payson <plpayson@gmail.com>,
       Stella Iannitto <stelacas@hotmail.com>,
       Stella Barber <stellabmakeup@gmail.com>,
       Jeremy Selenfriend <JSelenfriend@aol.com>,
       Shije Sollid <shije19@gmail.com>,
       Tom Taylor <paleolithc@gmail.com>,
       Dan Harray <danielmharray@aol.com>,
       SUZANNA HAY <abuhleen@gmail.com>,
       Anupama Chakravartti <achakravartti@gmail.com>,
       Dara Wishingrad <dhiwish11@aol.com>,
       btc213@gmail.com,
       Cheryl Olszowka <cheryl_olszowka@yahoo.com>

date:    May 21, 2011, 12:40 PM

subject:    HEADS UP Full Crew Production Meeting

signed-by:    yahoo.com

:    Important mainly because of the words in the message.

## HEADSUP CONTACT LIST

| Swing | Martin Toro | 646.399.0814 | martin.toro.76@gmail.com |
|---|---|---|---|
| **ART** | | | |
| Production Designer | Dara Wishingrad | 917.968.1958 | dhiwish11@aol.com |
| Set Dresser | Tom Taylor | 904.891.9264 | paleolithc@gmail.com |
| Prop Master | Brandon | 973 652 7569 | btc213@gmail.com |
| Art Assistant | Ravi | 347 870 6144 | raviwilkie@gmail.com |
| Art Assistant | Anumpama | 917-435-2402 | achakravartti@gmail.com |
| **MAKE UP** | | | |
| Make Up Artist | Stella Barber | 917.597.1275 | stellabmakeup@gmail.com |
| SFX Make Up | Jeremy Selenfriend | 973.479.3555 | JSelenfriend@aol.com |
| **LOCATIONS** | | | |
| Location Mgr. | Shije Sollid | 917.826.1288 | shije19@gmail.com |
| Location Scout | Elya Ottenberg | 917.226.7175 | elsousio@yahoo.com |
| St. Cecilia's | Mary Ann | 718.389.0010 | |
| **RENTALS** | | | |
| Hand Held Films | Alex | 212.502.0900 | www.handheldfilms.com |
| CC Rentals (van) | Alex Resnikoff | 212.239.3333 | |
| Professional Sound Services | Kevin | 212.586.1033 | info@prosound.com |
| **ON SET PHOTOGRAPHY** | | | |
| Photographer | Noam Harary | 732.245.8748 | noamharary@gmail.com |
| **VEHICLES** | | | |
| Key PA | Martin Peacock | 917.538.4940 | mpeacock223@gmail.com |
| Driver PA/Minivan | Noam Harary | 732.245.8748 | noamharary@gmail.com |

## Revised Contact List    Inbox ×    [Imap]/Sent ×



Wed, May 25, 2011, 7:51 PM

**Samantha Santos** <samantha.santos21@gmail.com>
to Hannah, Gary, me, Stella, abuhleen, lukaszdp, Jon, giacomo, namcho1983, sound, Phillips, danielmharray, Jigme, gautam kadian, Martin, Dara, paleolithc, btc213, raviwilkie, shije19, achakravartti, s ▾

Hey everyone,

There have been some modifications to the Contact List. Please let me know if you have any questions.

• • •



 HeadsUp Contact L...

| from: | **Samantha Santos** <samantha.santos21@gmail.com> |
| to: | Hannah Fierman <hannahfierman@gmail.com>, |
| | Gary Gimelfarb <garygimel@gmail.com>, |
| | alexander.merkin@gmail.com, |
| | Stella Iannitto <stelacas@hotmail.com>, |
| | abuhleen@gmail.com, |
| | lukaszdp@gmail.com, |
| | Jon Carr <joncarr@visualcinema.com>, |
| | giacomo francia <francia.giacomo@gmail.com>, |
| | namcho1983@gmail.com, |
| | sound@sonamgray.com, |
| | Phillips Payson <plpayson@gmail.com>, |
| | danielmharray@aol.com, |
| | Jigme <jigme.dp@gmail.com>, |
| | gautam.kadian@gmail.com, |
| | Martin Toro <martin.toro.76@gmail.com>, |
| | Dara Wishingrad <dhiwish11@aol.com>, |
| | paleolithc@gmail.com, |
| | btc213@gmail.com, |
| | raviwilkie@gmail.com, |
| | shije19@gmail.com, |
| | achakravartti@gmail.com, |
| | stella barber <stellabmakeup@gmail.com>, |
| | jselenfriend@aol.com, |
| | elsousio@yahoo.com, |
| | noamharary@gmail.com, |
| | mpeacock223@gmail.com |
| cc: | ROBERT KRAKOVSKI <r2tk@verizon.net> |
| date: | May 25, 2011, 7:51 PM |
| subject: | Revised Contact List |
| mailed-by: | gmail.com |
| signed-by: | gmail.com |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
============================ X          Index No.: 12 Civ. 3492 (RJS)(HBP)

16 CASA DUSE, LLC,

       Plaintiff and Counterdefendant,

         -against-

ALEX MERKIN,

       Defendant and Counterclaimant,

         -and-

A. MERKIN ENTERTAINMENT, LLC,

       Defendant.

========================= X

## DECLARATION OF DARA WISHINGRAD

DARA WISHINGRAD declares as follows:

1. I have been engaged in the motion picture industry for over 10 years as a production

designer. During such period I have production designed over 20 films.

2. I was retained by 16 Casa Duse and Robert Krakovski to be the Production Designer on

the short film titled "Heads Up" which was directed by Alex Merkin ("Film").

3. I have been requested by Alex Merkin to describe his involvement with my creative input

in making the Film and whether a person named William Porter was a producer of the Film.

4. I can say that the only producer(s) who I worked with and who had some involvement

with the Film were two co-producers named Gary Gimelfarb and Hannah Fierman. William Porter

neither appeared on the set nor had any involvement with me during negotiations of my services, or

pre-production or production of the Film. Based on my experience in the Film Industry, such a lack

of involvement by a producer is most unusual. In fact, before this declaration I had never heard of

William Porter and as of this declaration; I have never met him and definitely can state that he did

not make any of the contributions to the Film usually made by a motion picture producer.

5. The screenplay lacked any description whatsoever about the setting or how it should be dressed. In fact, it did not even contain a location description (i.e. house, apartment, store, living room, bedroom, basement, backroom, etc) besides being called a "poorly-lit room". At some point in the pre-production phase, Robert Krakovski brought me to his house and offered to let me "shop" in his house and pointed out pieces he thought would work. Most of the things he suggested either did not work or were just inappropriate for the mood and feel of the story.

6. Alex Merkin created a detailed and extensive backstory about the main characters and their relationship to the setting in order to help inform me about set design. He furthermore advised me on the types of furniture and props to be used to dress the set. His input included such details as the size and shape of the table to be used for the card game; the color of the felt on top of the table; type of cupboard to obtain and the china which was to be placed in it; the types of cups used by the two actors; the liquor used, the shape of the bottle and design of its labels; the stacks of DVD player and electronic equipment boxes in the next room (indicating the main character's profession); the cereal boxes and microwave dinner dishes; all of which were used to create a mood which he wanted. Alex Merkin was most clear and insightful in creating the mood and context of the setting for the Film which was crucial to its design.

7. The only person seeking to create a moody atmosphere rich with texture and history in the Film was Alex Merkin. I received no such direction of any kind from Robert Krakovski. In fact, over the course of my association with the Film, Mr. Krakovski displayed a complete lack of experience and knowledge of how to make a movie. Despite informing me that he was hiring seasoned professionals to make the film for him so that he could learn about filmmaking, he repeatedly demonstrated an unwillingness to learn about the process, often to the point of sabotaging my ability to do or complete my job.

I declare under penalty of perjury that the foregoing is true and correct. Executed in New

York City on October 19 2012

DARA WISHINGRAD

## DECLARATION OF GARY GIMELFARB

GARY GIMELFARB, declares as follows:

1. I have been engaged in the entertainment industry since 1999, serving in a variety of roles professionally including producer, executive producer, line producer and production manager.

2. I was retained by 16 Casa Duse and Robert Krakovski to be a co-producer on the short film titled "Heads Up" which was directed by Alex Merkin ("Film").

3. I have been requested by Alex Merkin to describe his involvement with my creative input in making the Film and whether a person named William Porter was a producer of the Film. I authorize Alex Merkin to use this Declaration and the facts in it in his law suit.

4. I was among the first persons hired to help Robert Krakovski produce the Film. I was present at all castings, pre-production meetings, location scouts, etc. and I was also present throughout the entire production. I had a fellow co-producer named Hannah Fierman.

5. If William Porter claims to be a producer of the Film it is a surprise to me as he did not perform any of the duties of producer and if he was given that title it was given to him after the Film was completed. I can verify that William Porter was not part of the pre-production planning or production at any point of the making the Film. In fact I did not even know that a person named William Porter was involved with the Film until I saw his name in the film's credits originally listed as one of three sound designers after the Film was completed.

6. There was only one director of the Film and that was Alex Merkin. I was present on the set the entire time while Alex Merkin was directing the Film. I saw that each person on set was getting their specific instructions from Merkin. I saw that every adjustment that was made in a scene, and every action that was taken by the cast and crew on set followed instructions given by Merkin. For example: Merkin advised the wardrobe director about what each character should be wearing; he advised the makeup director about levels of sweat and blood in the scene. Merkin

advised the actors about their dialogue, blocking and gestures (when to grab the bottle, where to place it, when to stand, how slowly one of the actors should wrap his fingers around the handle of the knife and how long to hold it there, how quickly one of the actors should bounce his leg in pain, etc), level of emotion and inflection on dialogue (whether moments are humorous, serious, meaning of certain phrases, etc) throughout the scene as well as details about their character and history.

7.  Robert Krakovski was sporadically present on the set while the Film was being shot. When he had a suggestion to add, he sought Merkin's approval to make such change and such change would only be made if Merkin approved it. Though such instances were rare.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Dated: New York City, New York October 1? 2012

GARY GIMELFARB

Sound Design

Brendan Baker

Robert Krakovski     William B. Porter

PRO SE INTAKE
105

CASE NO. 12 Civ. 3492
(RJS)

FROM ALEXANDER MERKIN

RECEIVED
SDNY PRO SE OFFICE
2019 MAY 15   AM 8: 36